UNITED STATES of America

v.

**Rosario GANGI, et al., Defendants.**

**No. 97 Cr. 1215(DC).**

United States District Court,
S.D. New York.

April 2, 1998.

Mayer, Brown & Platt by James J. McGuire, New York City, for Defendant Gordon Hall.

Morrison & Foerster LLP by Howard E. Heiss, Jamie A. Levitt, New York City, for Defendants Lawrence Schneider and Arnold Schneider.

Thomas J. Marlowe, Thomas M. Connelly, Phoenix, AZ, for Defendant Joseph Kirkham.

Joseph Tacopina, New York City, for Defendant Rosario Gangi.

Daniel A. Conti, Hempstead, New York, for Defendant Daniel Guma.

Murray & McCann by Francis J. Murray, Rockville Centre, New York, for Defendant Irwin Schneider.

Brian Hansbury, for Defendant Montevecchi.

Frank A. Lopez, for Defendant Cerasani.

Jeffrey Lichtman, for Defendant Iodice.

Saul Roffe, for Defendant Lyons.

James DiPietro, for Defendant Scarpaci.

Akin, Gump, Strauss, Hauer & Feld, L.L.P. by John M. Dowd, Leslie M. Turner, Washington, DC, for Ivan K. Mathew.

Mathew J. Marx, for Defendant Frank Lino.

Michael L. Macklowitz, for Defendant Salvatorre Taddeo.

Barry Turner, for Defendant Michael Motsykulashvili.

Murray & McCann by Francis J. Murray, for Defendant Irwin Schneider.

Phil Defonte, Larry J. Silverman, for Defendant Joseph Sorrentino.

Ralph P. Cafaro, for Defendant Eugene Lombardo.

Vincent Gelardi & Douglas Grover, for Defendant Robert Schwickrath.

## OPINION

CHIN, District Judge.

Mary Jo White, U.S. Attorney for the Southern District of New York by Celeste L. Koeleveld, Douglas M. Lankler, Jason Sabot, Assistant U.S. Attorneys, New York City, for U.S.

In this case, a highly confidential, internal government memorandum—which lays out the Government's strategy and identifies wit-

nesses and victims—somehow made its way into a public court file. An FBI agent handed what he believed to be a copy of the indictment to an Assistant United States Attorney in open court in Phoenix, Arizona. The Assistant, in turn, handed up the document to the Magistrate Judge presiding over the proceedings. Neither the agent nor the Assistant nor the Magistrate Judge realized that the document actually consisted of a draft of the indictment as well as a prosecution memorandum that had been written by the United States Attorney's Office for the Southern District of New York for the United States Department of Justice. As a consequence, the prosecution memorandum, which contains privileged work product and other sensitive information, was given to one of the defendants and placed into the public record. Eventually it was widely distributed to members of the public.

The principal issue before the Court is whether the Government has waived its claim of privilege to the prosecution memorandum. I hold that it has. The Government did not treat the document with the care required to protect its privilege. As a result, two defendants and their lawyers have seen it and dozens of copies are circulating in the public domain. Under these circumstances, the Government's motion for "return" of the prosecution memorandum is denied.

My findings of fact and conclusions of law follow.

## THE FACTS

### A. *Nature of the Case*

The indictment in this case charges 19 defendants with racketeering, securities fraud, wire fraud, extortion, and bank fraud. Specifically, the indictment charges that the defendants engaged in a scheme to defraud investors by manipulating the market price of the securities of HealthTech International Inc. ("HealthTech"). The Government alleges that HealthTech officers enlisted the aid of members and associates of organized crime families, who controlled certain stock brokerage firms, to artificially inflate the price of HealthTech stock through the use of deceptive practices and threats of violence.

### B. *The Prosecution Memorandum*

In the fall of 1997, after a year-long investigation, the United States Attorney's Office for the Southern District of New York (the "Southern District") prepared a prosecution memorandum (the "Prosecution Memorandum") requesting that the Organized Crime and Racketeering Section of the Department of Justice ("DOJ") approve the filing of a proposed indictment in this case. DOJ approval is required before a U.S. Attorney's Office may bring charges under certain statutes, including the Racketeer Influenced and Corrupt Organizations Act ("RICO").

The first page of the 69-page Prosecution Memorandum begins as follows:

PROSECUTION MEMORANDUM

(This Document Contains Grand Jury Material)

To: Paul E. Coffey, Chief, Organized Crime and Racketeering Section, United States Department of Justice

From: [the names of four Assistant U.S. Attorneys from the Southern District of New York are listed]

Date: November 7, 1997

Re: Proposed Prosecution in *UNITED STATES v. ROSARIO GANGI, et al.*

Although the Prosecution Memorandum bears the parenthetical at the top of the first page stating that "This Document Contains Grand Jury Material," it is not marked "confidential" or "privileged" or "government work product" or anything else to that effect.

The Prosecution Memorandum then summarizes the Government's case and describes the alleged racketeering enterprise, the defendants, the alleged racketeering activity, and the alleged scheme to manipulate the market for HealthTech stock. It identifies witnesses, including alleged victims and cooperating witnesses, and describes their anticipated testimony. It discloses the contents of surreptitiously recorded conversations involving the defendants. It describes one cooperating witness as having "disappeared" and "ceased communicating with the FBI ...

[s]hortly after" certain consensual recordings were made.

The Southern District transmitted the Prosecution Memorandum and a draft indictment to DOJ on November 20, 1997. The same day, the Southern District provided copies of the Prosecution Memorandum and draft indictment to Special Agent Stephen B. Hessinger, the FBI "case agent" and a member of the Joint Organized Crime Task Force (the "Task Force"), "for his review and comment." Hessinger combined the 75–page draft indictment with the 69–page Prosecution Memorandum to create a single document, 144 pages long, with the draft indictment on top and the Prosecution Memorandum underneath it (the "Document").

Hessinger made several copies of the Document and distributed them to his supervisors and other members of the Task Force who were assigned to the investigation, including Detective Christine McNulty, the "case officer."

## C. *Agent Young*

During the week of November 10, 1997, Special Agent Brian Young was told by his supervisors that he would be part of the team responsible for arresting defendant Gordon Hall in Phoenix, Arizona on November 25th. Young had only recently graduated from the FBI Academy, in July 1996. After six months conducting background checks, he was assigned to the Task Force in February 1997, when he began working on this investigation.

On November 20th, in preparation for that assignment, Young asked for a copy of the indictment from a member of his squad in the Task Force. He was informed that there was a copy on McNulty's desk. McNulty was not present at the time.

Young proceeded to McNulty's desk and picked up what he believed was a copy of the indictment but which actually was the Document. He noticed a handwritten note at top of the first page of the Document, which read "1:30 p.m. Th." [1] He "assumed" that the Document was a draft of the indictment. (Young

Aff. ¶ 5). Although he was correct in part, he did not realize that the Document also included the Prosecution Memorandum.

Young made two copies of the Document. He returned the original to McNulty's desk and put one copy of the Document, secured with a rubber band, into his brief case along with other materials relating to Hall. He gave the other copy to another agent.

On Sunday, November 23rd, Young flew to Arizona. He started to review the Document that night, but only read the first 10 or 15 pages. The next day, November 24th, he reported to the FBI's field office in Phoenix. That evening, he read "almost the entire Document, including the proposed indictment and most of what [he later learned] to be the [P]rosecution [M]emorandum." (Young Aff. ¶ 7). Although he saw the Prosecution Memorandum, he did not find it strange that it was attached to the indictment. Prior to this case, Young had never seen an indictment, information, complaint, or prosecution memorandum.

## D. *The Unsealing of the Indictment*

On Tuesday, November 25th, at approximately noon in New York, the final indictment in this case, consisting of 97 pages and 25 counts, was unsealed. The Southern District did not make any arrangements to have the final version of the indictment transmitted, either directly or indirectly through the FBI, to the U.S. Attorney's Office in Arizona for use at Young's presentment after he was arrested. Indeed, as the Government reported at oral argument:

> [The indictment] was finalized before the grand jury presentation on Monday when the indictment was returned, and Agent Young was already on his way to Arizona at that time. So the answer is no, he didn't take a final copy with him and it wasn't sent out to him.
>
> [T]here are a number of people who could have sent a copy over. An [A]ssistant U.S. Attorney could have done so in response to a call from [Assistant United States Attorney W. Allen] Stooks or an

---

1. In his affidavit, Young stated that the handwritten note said "Thurs 3 p.m." His recollection apparently is inaccurate, as the note actually reads "1:30 p.m. Th."

FBI agent could have done so that day in response to a call from Agent Young saying, Hey, we need a final copy out here.

I think that there was no request from Arizona, there was no alert that, Hey, we don't have one out here. So the people here assumed they had one. And given that other people could have sent it over, the FBI could have thought the government did it.

.     .     .     .     .

We really didn't know they didn't have one. It isn't like there was one person who was in charge of that particular item. There were a lot of things going on that day and we assumed it had been taken care of. . . .

(3/17/98 Tr. at 51).

### E. *Hall's Arrest and Presentment*

On Tuesday morning, November 25th, at approximately 8 a.m. Phoenix time, Hall was arrested in Arizona. Young participated in the arrest.

At approximately 3:30 p.m. that day, Hall was presented pursuant to Fed.R.Crim.P. 40 before Magistrate Judge Virginia Mathis in the United States District Court for the District of Arizona. The Government was represented at the presentment by Assistant United States Attorney W. Allen Stooks, an experienced prosecutor and a former state court judge.

Stooks met with Young in the courtroom shortly before the scheduled court appearance. He asked Young for the arrest warrant and a copy of the indictment. Young advised Stooks that while he had the arrest warrant, he had left the indictment at the FBI field office. Stooks asked Young to have another agent obtain the indictment.

When the proceedings commenced, neither Stooks nor Young had a copy of the indictment. Almost immediately, Judge Mathis asked Stooks for a copy of the indictment. Stooks responded:

Judge, the agent has a copy of the indictment, and it's at the Phoenix office of the FBI here, and I think that's—the indictment—I think they'll get a hold of somebody to bring it. It's quite thick, so I think that's why it wasn't faxed.

(11/25/97 Tr. at 2).

A few minutes later, the Document arrived in court. The transcript reports the following colloquy:

MR. STOOKS: Judge, I have a copy of the indictment now.

THE COURT: Okay.

MR STOOKS: I only have one copy. It's about a hundred pages, so I don't know if you wanted to have your clerk make copies for the defendant and his attorney, or what you want to do.

THE COURT: Well, somebody will need to make him a copy. Is he the only person named in the indictment, or are there numerous—

MR. STOOKS: No. No, there's other names. I don't know if—the rest of it's—do you know if it's sealed or not, the rest of it?

AGENT YOUNG: That I don't know. All of the individuals in the indictment were arrested today.

MR. STOOKS: Oh, they've all been arrested. He just told me so. It wouldn't be sealed, Judge.

THE COURT: Okay. If I could just see it for a moment, please. [Pause] Okay. Mr. Hall, this is 97 count indictment. I don't know if you're named in all 97 counts or not.[2]

Do you have any kind of summary of the charges or anything?

AGENT YOUNG: I can provide one. Your Honor, my name is Brian Young. I'm a special agent from the New York office, FBI.

(*Id.* at 4–5). Young then endeavored to summarize the charges against Hall for the Court.

Stooks did not review the Document before handing it up to Judge Mathis. Judge Mathis looked at the Document briefly on the

---

2. The reference to 97 counts is inaccurate, as the draft indictment before Judge Mathis contained only 28 counts. In addition, although Stooks at one point said on the record that the indictment is "about a hundred pages" (11/25/97 Tr. at 4), in fact the draft indictment was only 75 pages.

bench, but she did not notice that the Prosecution Memorandum was part of it.

### F. *Distribution of the Prosecution Memorandum*

Hall was represented at the presentment by Gregory A. Larson, an Arizona attorney who was HealthTech's "corporate in-house counsel." During the course of the presentment, Judge Mathis advised Hall that the Court would be providing him with a copy of the indictment. When the proceedings ended, Hall and Larson waited a "considerable amount of time" for a copy of the indictment, but the Court's clerk eventually informed them that a copy would be available for pick up the next day.

The next day, Larson returned to the Court. A Court employee gave him a copy of the Document. Larson returned to HealthTech's offices, where the Document was copied and distributed to Hall and the following officers or employees of Health-Tech: William A. Young, Sr., Timothy Williams, Stephen Smith, and Sandra Young.

Within a few days, Smith was discharged by HealthTech. At some point after his dismissal, he provided a copy of the Document to an attorney in California. On or about December 4th, William Young caused five copies of the Document to be filed in a NASDAQ "de-listing" proceeding in Washington, D.C. Portions of the Prosecution Memorandum were read and discussed during the NASDAQ hearing. During the first week of December, a copy of the Document was also sent by HealthTech to its outside auditors. From November 26th through December 16th, 20 to 40 or more copies of the Document were distributed by Hall, Sandra Young, William Young, and HealthTech support staff to stockholders, stockbrokers, and potential investors. No record was kept of the individuals to whom these copies were distributed. These copies were provided in response to requests for information about HealthTech and the indictment. These individuals, in turn, may have distributed copies of the Prosecution Memorandum to others.

From November 26th through early to mid-December, the Document remained in the public court file in the United States District Court in Phoenix. No records are kept of who examines court files in the Clerk's Office in that Court, and at least one lawyer not involved in this case obtained a copy of the Document from the court file in Phoenix. On December 1, 1997, after reading about this case in an Arizona newspaper, Allen B. Bickart, an Arizona attorney who is not involved in this case, went to the Clerk's Office in the United States District Court in Phoenix. He asked for a copy of the "charging document" in this case and, for a fee of $72, received a copy of the Document—including the Prosecution Memorandum—from the Clerk's Office.

On December 2nd, Hall retained Ivan K. Mathew to represent him in the criminal proceedings. The same day, he provided Mathew with a copy of the Document. On December 5th, in reviewing the Document, Mathew realized that it included the Prosecution Memorandum. He inquired as to how it was obtained and was told that it had been obtained from the United States District Court in Arizona. Eventually, Mathew provided copies of the Document to James J. McGuire, Hall's New York attorney, as well as to Thomas Connelly, a Phoenix lawyer who represents defendant Joseph Kirkham in this case. Hall provided a copy of the Document to Kirkham shortly after he received it on November 26, 1997.

### G. *Hall's Arraignment in New York*

On December 5th, the Clerk's Office for the United States District Court for the District of Arizona transmitted the file to the United States District Court for the Southern District of New York. The file was docketed here in this Court on December 16, 1997. Hence, the Document was part of the public court file in the District of Arizona from November 25th through December 5th and part of the public court file here in the Southern District of New York starting on December 16th.

On December 17, 1997, Hall was arraigned in this District before Magistrate Judge Michael H. Dolinger. Hall was represented by Mathew and McGuire. The Government was represented by Assistant United States At-

torney Douglas M. Lankler. During a discussion of bail, Mathew stated that:

One of the things that the Government—that this Court may consider for purposes of bail is the strength of the Government's evidence. We have obtained the [P]rosecution [M]emorandum[ ] from the United States Attorney's Office. . . .

(12/17/97 Tr. at 7). Mathew then read a brief excerpt from the Prosecution Memorandum. Neither the Court nor counsel made any further mention of the Prosecution Memorandum at the arraignment. Bail was set and Hall pled not guilty to the charges against him.

## H. *The Government's Efforts to Retrieve the Prosecution Memorandum*

Following the arraignment on December 17th, Mathew and McGuire met with Lankler and Assistant United States Attorney Jay Holtmeier. During that meeting, Mathew and McGuire confirmed that they had a copy of the Prosecution Memorandum. Mathew explained that the Prosecution Memorandum had been obtained in connection with Hall's presentment in Arizona. The Government did not ask for the return of the Prosecution Memorandum at that time.

Later that day, Holtmeier learned that Young had inadvertently provided a copy of the Prosecution Memorandum to the Court in Arizona. The Government eventually discovered that the Document was in the public file that had been forwarded to this Court from the District of Arizona. The same day, at the direction of a supervisor in the Southern District, and with the permission of a member of the Clerk's Office of this Court, Lankler separated the Prosecution Memorandum from the draft indictment and removed the Prosecution Memorandum from the court file.[3]

Also on December 17th, Holtmeier telephoned Mathew. He was unable to speak to him, however, until the next day. Holtmeier asked Mathew to return the Prosecution Memorandum, but Mathew refused, saying he needed some time to consider the issue.

He also declined to answer Holtmeier's questions as to whether copies of the Prosecution Memorandum were distributed to anyone else and, if so, to whom.

Thereafter, on December 18th, the Government appeared before the Court *ex parte* and requested certain relief. With a court reporter present, I telephoned Mr. Mathew. We had a second telephone call, joined in by McGuire. Mathew and McGuire contended, among other things, that the Government had waived any claim of privilege. Part of the telephone conversation was *ex parte* and part of it was conducted in the presence of the Government.

At the conclusion of the December 18th hearing, I issued an oral order directing "any and all defense counsel, defendants, and any other individuals, other than the government, . . . who may have obtained the [P]rosecution [M]emorandum" to return all copies of the Prosecution Memorandum to my chambers, to be held pending a decision by me as to whether there was a privilege and if so whether the privilege had been waived. (12/18/97 Tr. at 19). I was under the impression at the time that distribution of the Prosecution Memorandum had been extremely limited and thus I believed that my order would control the situation and minimize any damage to the Government and the threat to witnesses until I could consider the privilege and waiver issues more fully.

Following the December 18th hearing, the Court received four copies of the Prosecution Memorandum from Mathew and McGuire. Two copies were returned directly to the Government. Eventually, however, I learned of the distribution of other copies, including, among others, the filing of five copies in the NASDAQ proceedings and the dissemination of 20 to 40 or more copies to stockholders, stockbrokers, and potential investors who could not be identified.

The Government initially moved for an order requiring the return of the Prosecution Memorandum and disqualifying certain defense counsel who had obtained copies of it.

---

3. The draft indictment was left in the file until February 3, 1998, when Special Assistant United States Attorney Jason Sabot removed it from the court file, with the knowledge and approval of an employee of the Clerk's Office of this Court.

By letter dated February 5, 1998, the Government asked the Court to "withhold consideration" of the disqualification request until after a decision was made on the first prong of the motion.

The defendants oppose the Government's request for return of the Prosecution Memorandum, for two reasons. First, they argue that the Government has waived any claim of privilege because it was "grossly negligent and extremely careless" in its handling of the Prosecution Memorandum. (3/17/98 Tr. at 34). Second, they argue that because "20 to 40 copies of this memorandum are floating out there somewhere," the Government has lost any claim of confidentiality because the "cat is out of the bag." (*Id.* at 31).

### DISCUSSION

#### A. The Work–Product Privilege

■ As a threshold matter, I hold that the Prosecution Memorandum is a privileged, confidential document. It contains the Government's attorney work product, setting forth the Government's legal theories, mental impressions, and thought processes. Consequently, it is protected by the work-product doctrine, which prohibits "unwarranted inquiries into the files and the mental impressions of an attorney." *Hickman v. Taylor*, 329 U.S. 495, 510, 67 S.Ct. 385, 91 L.Ed. 451 (1947); *accord In re Grand Jury*, 138 F.3d 978, 980 (3d Cir.1998); *United States v. Nobles*, 422 U.S. 225, 238 & n. 12, 95 S.Ct. 2160, 45 L.Ed.2d 141 (1975); *In re Grand Jury Subpoenas Dated Oct. 22, 1991 & Nov. 1, 1991*, 959 F.2d 1158, 1166 (2d Cir.1992).[4] Indeed, the Prosecution Memorandum falls squarely under the protection of Rule 16(a)(2) of the Federal Rules of Criminal Procedures, which specifically exempts from disclosure "reports, memoranda, or other *internal government documents* made by the attorney for the government or any other government agent investigating or prosecuting the case." (Emphasis added). *See also* Fed.R.Civ.P. 26(b)(3).

---

**4.** To qualify as work product, "[t]he material must (1) be a document or tangible thing, (2) that was prepared in anticipation of litigation, and (3) was prepared by or for a party, or by or for his representative." *Niagara Mohawk Power Corp. v.*

#### B. Inadvertent Disclosure

■ Even privileged documents, however, are not protected if a party voluntarily discloses them. If a party voluntarily discloses a privileged document, it waives the privilege for that document and cannot later seek to keep the document confidential. *Carter v. Rosenberg & Estis, P.C.*, No. 95 Civ. 10439, 1996 WL 695866, at *2 (S.D.N.Y. Dec.4, 1996) (citing *In re von Bulow*, 828 F.2d 94, 101 (2d Cir.1987) (upholding finding of waiver where party consented to publication of confidential communications in his attorney's book); *Eigenheim Bank v. Halpern*, 598 F.Supp. 988, 991–92 (S.D.N.Y.1984) (finding waiver where defendants twice produced confidential documents)).

Not surprisingly, from time to time litigants err and inadvertently disclose a privileged document. A body of case law has developed with respect to whether the inadvertent disclosure of a document protected by the attorney-client or work product privilege results in a waiver of the privilege. These cases, however, are only somewhat helpful, for most are civil cases involving the inadvertent production of a few pages of a privileged document during the course of the production of thousands of pages of documents in discovery. In addition, the privileged documents are not publicly filed in these cases; rather, they are produced to only one party—the other side in a lawsuit.

The case most analogous to this case is *Carter v. Gibbs*, 909 F.2d 1450 (Fed.Cir. 1990). There, the Government inadvertently appended an internal DOJ memorandum, containing attorney work product, to the copy of a Government brief that was served on the opposing party in a civil case. The court held that the Government had waived the work product privilege. Adopting a strict approach, the court ruled that it was "irrelevant" that the disclosure was inadvertent, observing that:

*Stone & Webster Eng'g Corp.*, 125 F.R.D. 578, 586 (N.D.N.Y.1989) (quoting *In re Grand Jury Subpoenas Dated Dec. 18, 1981 & Jan. 4, 1982*, 561 F.Supp. 1247, 1257 (E.D.N.Y.1982)).

[The] purpose [of the work product privilege] is to prevent the disclosure of an attorney's mental impressions and thought processes either to an opponent in the litigation for which the attorney generated and recorded those impressions, or to a third party with interests not 'common' to those of the party asserting the privilege....

... Voluntary disclosure of attorney work product to an adversary in the litigation for which the attorney produced that information defeats the policy underlying the privilege.... *Granting the motion would do no more than seal the bag from which the cat has already escaped.*

*Id.* at 1451 (emphasis added) (citations omitted); *accord In re Sealed Case*, 877 F.2d 976, 980 (D.C.Cir.1989) ("[I]f a client wishes to preserve the privilege, it must treat the confidentiality of attorney-client communications like jewels—if not crown jewels. Short of court-compelled disclosure, or other equally extraordinary circumstances, we will not distinguish between various degrees of 'voluntariness' in waivers of ... privilege.") (citation and footnote omitted); *FDIC v. Singh*, 140 F.R.D. 252, 253 (D.Me.1992) (applying strict accountability rule because "[o]ne cannot 'unring' a bell").

■ Defendants ask this Court to apply the strict accountability approach applied in *Carter* and the other cases cited. I decline to do so. Although the Second Circuit has not ruled directly on this issue, the prevailing view in this District, as well as in the majority of the Circuits, is that a more flexible, "middle of the road approach" should be applied. *See, e.g., Asian Vegetable Research & Dev. Ctr. v. Institute of Int'l Educ.*, No. 94 Civ. 6551, 1995 WL 491491, at *7 (S.D.N.Y. Aug.17, 1995); *Desai v. American Int'l Underwriters*, No. 91 Civ. 7735, 1992 WL 110731, at *1 (S.D.N.Y. May 12, 1992); *Gray v. Bicknell*, 86 F.3d 1472, 1484 (8th Cir.1996) ("The middle test provides the most thoughtful approach, leaving the trial court broad discretion as to whether waiver occurred and, if so, the scope of that waiver."); *Alldread v. City of Grenada*, 988 F.2d 1425, 1434 (5th Cir.1993). Under this more flexible approach, "inadvertent production will not

waive the privilege unless the conduct of the producing party or its counsel evinced such extreme carelessness as to suggest that it was not concerned with the protection of the asserted privilege." *Desai*, 1992 WL 110731, at *1; *see also Bank Brussels Lambert v. Credit Lyonnais (Suisse), S.A.*, 160 F.R.D. 437, 443 (S.D.N.Y.1995) (endorsing approach to inadvertent disclosure that privilege waived "only if the producing party failed to take reasonable precautions to maintain their confidentiality"). Although this rule recognizes that mistakes will be made given "the realities of the discovery process in complex litigation," *Asian Vegetable Research*, 1995 WL 491491, at *7, it also creates an incentive for counsel to guard the privilege closely, as the failure to take reasonable precautions will result in a waiver.

■ The case most often cited in this respect is *Lois Sportswear, U .S.A., Inc. v. Levi Strauss & Co.*, 104 F.R.D. 103 (S.D.N.Y. 1985), in which Judge Sweet held that four factors should be considered to determine whether a party has been sufficiently careful in producing documents for discovery: (1) the extent to which reasonable precautions were taken to avoid disclosure of privileged documents; (2) the scope of discovery as compared to the amount of privileged material disclosed; (3) the amount of time taken to correct the error; and (4) the overreaching issue of fairness. *Id.* at 105; *see also Aramony v. United Way of America*, 969 F.Supp. 226, 235 (S.D.N.Y.1997); *Hydraflow, Inc. v. Enidine Inc.*, 145 F.R.D. 626, 637 (W.D.N.Y.1993).

The four *Lois* factors are not perfectly applicable to this case because of the different discovery rules governing criminal cases and because we are concerned here with inadvertent filing, not production. Nonetheless, the *Lois* test is still a useful framework to apply, and I apply it now.

C. *Application of the Lois Factors*

1. *The Degree of Care Taken By the Government*

■ The first factor to consider is the extent to which the Government took reasonable precautions to avoid disclosure. The

Government argues that it did take reasonable precautions, and that the disclosure of the Prosecution Memorandum resulted from "an unfortunate chain of events rather than 'extreme carelessness.'" Hence, the Government contends, there was no waiver.

I agree with the Government that the inadvertent disclosure of the Prosecution Memorandum was the result of "an unfortunate chain of events." These "events" included the following:

● The Government did not label the Prosecution Memorandum "confidential," "privileged," or "work product." [5]

● The Southern District apparently gave no instructions to the FBI when it sent over the Prosecution Memorandum, and the FBI supervisors apparently gave no instructions to the agents and detectives who received the Document about its confidential and sensitive nature.

● The FBI did not act with due care in the dissemination of the Document, which apparently was distributed to individuals who, although affiliated with the FBI or the Task Force, did not really need to see it. Instead of being filed or placed in a drawer, the Document was left unsecured on the top of the case officer's desk. Even though the area was accessible only to authorized personnel, the Document still would have been in plain view of individuals who had no reason to see it.

● Although the indictment was unsealed at noon in New York, and although it is a fundamental proposition that the charging instrument should be available at a Rule 40 presentment, no one in the Southern District took any steps to ensure that the final indictment would be available for use at Hall's presentment at 3:30 p.m. in Phoenix. The Southern District had more than enough time to fax the indictment—even at 97 pages—to Phoenix, but no one was in charge of this task and, as the Government con-

cedes, it was simply assumed that arrangements had been made.

● Young's training was inadequate and his supervision was patently deficient. He apparently did not know what an indictment was and was unable to distinguish between an indictment and an internal government memorandum. Still, he had more than an ample opportunity to review the Document and had read "almost the entire Document." He saw the reference on the first page of the Prosecution Memorandum to "Grand Jury Material," saw that it was addressed to DOJ from Assistant United States Attorneys in the Southern District, and saw that it identified witnesses and victims and summarized their anticipated testimony. Yet, inexplicably, he still did not realize that the Prosecution Memorandum was not part of the indictment.

● Even though Young believed that his copy of the indictment was a draft, he handed the Document to Stooks knowing that Stooks was going to hand it up to the Court, without making any mention of his belief that the indictment was merely a draft.

● Stooks started the presentment without any copy of the indictment. Although Stooks had no reason to believe that when he asked Young for a copy of the indictment Young would give him a draft indictment that had a confidential prosecution memorandum appended to it, still, Stooks did not bother to review the Document. In fact, the draft indictment was not signed and the handwritten notation "1:30 Th." on the first page in the upper-right hand corner should have raised a question in Stooks's mind. Apparently, it did not. Moreover, the draft indictment he submitted to the Court was substantially different from the version approved by the grand jury; the draft was 22 pages shorter than the actual indictment and it contained 28 rather than 25 counts.

Standing alone, each of the individual "events" in this "unfortunate chain" is argu-

---

**5.** If it had been so marked, Young might have realized that this was not a document that should be handed up to the Court. If it had been marked as "confidential work product," the Magistrate Judge might have noticed it when she reviewed the Document quickly on the bench.

*See Bank Brussels Lambert v. Chase Manhattan Bank, N.A.,* No. 93 Civ. 5298, 1996 U.S. Dist. LEXIS 18849, at *14 (S.D.N.Y. Dec. 16, 1996) (court found precautions unreasonable where documents were not adequately labelled to put others on notice of their confidential nature).

ably understandable and perhaps excusable. In combination, however, they demonstrate that the Government failed to take reasonable precautions to avoid inadvertent disclosures of the type that occurred here.

■ If anything, the Government has a higher duty and must take even greater care to protect its privileges than a private litigant in a civil dispute. The inadvertent disclosure of a prosecution memorandum such as the one at issue here discloses not only mental impressions and thought processes of the government lawyers, but also reveals grand jury material and potentially places victims and witnesses at risk. The Government had even more reason to act cautiously in this case because of the alleged involvement of organized crime. Clearly, the Government did not meet its responsibilities here.

Hence, the first factor weighs heavily in favor of a finding of waiver.

### 2. The Scope of Discovery

The second factor involves a comparison of the number of inadvertently produced documents (or pages) to the number of documents (and pages) produced as a whole. This factor does not apply seamlessly to the facts of this case because the inadvertent disclosure did not occur in the context of discovery or a document production. Nonetheless, this factor also weighs in favor of waiver, for only one document—the indictment—was in essence to be "produced." Where numerous documents are involved and thousands of pages are produced, errors are more understandable. Because of the sheer volume of such productions, mistakes may occur. See, e.g., Lois Sportswear, 104 F.R.D. at 105 (where twenty-two documents out of 16,000 pages reviewed, and out of 3,000 pages requested, were claimed to be privileged, court held that disclosure did not constitute a waiver); Data Sys. of New Jersey, Inc. v. Philips Bus. Data Sys., Inc., No. 78 Civ. 6015, slip op. (S.D.N.Y. Jan. 8, 1981) (where one document was privileged among the several thousand produced, court held that the privilege was not waived); Desai, 1992 WL 110731, at *1 (where seventeen documents were privi-

leged out of a "large production," court held that privilege was not waived).

Here, the Government does not have the excuse that it was producing thousands of pages of documents. To the contrary, the inadvertent disclosure occurred before discovery even began. Knowing days in advance that the presentment was going to take place on November 25th, the Government had a simple task—to provide the Court in Arizona and Hall with a single document, a copy of the charging instrument. Yet, the Government was unable to perform that task properly.

### 3. The Government's Response

The third factor is whether the party that inadvertently discloses the privileged document seeks relief promptly upon learning that privileged information has been disclosed. See Georgia–Pacific Corp. v. GAF Roofing Manuf. Co., No. 93 Civ. 5125, 1995 WL 117871, at *2 (S.D.N.Y. Mar. 20, 1995). Here, I am satisfied that, on the whole, the Government acted reasonably and promptly after it learned of the inadvertent disclosure. It placed a telephone call to Mathew the same day to request return of the Prosecution Memorandum. It sought relief from the Court the next day when Mathew refused to comply with the Government's request for return of the Prosecution Memorandum. See H.W. Carter & Sons, Inc. v. William Carter Co., No. 95 Civ. 1274, 1995 WL 301351, at *3–4 (S.D.N.Y. May 16, 1995) (held no inadvertent production where counsel took steps to identify and segregate privileged documents and immediately asserted the privilege upon learning of the inadvertent disclosure). Although the Government arguably could have taken more action after December 18th, including following up with Larson, it reasonably believed, based on the information available at the time, that the Court's December 18th order, which ordered "any and all defense counsel, defendants, and any other individuals ... who may have obtained the [P]rosecution [M]emorandum" to return all copies to the Court, was sufficient to address the situation.

The third factor, therefore, weighs against a finding of waiver.

### 4. Considerations of Fairness

Finally, the "overreaching" issue is fairness. A number of considerations come into play.

First, the Prosecution Memorandum was publicly filed and widely distributed. Some 20 to 40 copies are unaccounted for, and even more may have been disseminated. It is well-established that "work product protection is waived when protected materials are disclosed in a manner which ... 'substantially increases the opportunity for a potential adversary to obtain the protected information.'" *Niagara Mohawk Power Corp. v. Stone & Webster Eng'g Corp.*, 125 F.R.D. 578, 590 (N.D.N.Y.1989) (quoting *In re Grand Jury Subpoenas Dated Dec. 18, 1981 & Jan. 4, 1982*, 561 F.Supp. 1247, 1257 (E.D.N.Y.1982)); *see In re Circle K Corp.*, Nos. 96 Civ. 5801 & 96 Civ. 6479, 1997 WL 31197, at *11 (S.D.N.Y. Jan. 28, 1997) (work product privilege waived if "the manner of disclosure made it likely that the information would be revealed to an adversary"). Here, there is little doubt that the Government's voluntary disclosure of the Prosecution Memorandum, however inadvertent, has substantially increased the opportunity for defendants to procure it. Counsel for two defendants already have seen it. *See International Digital Sys. Corp. v. Digital Equip. Corp.*, 120 F.R.D. 445, 449 (D.Mass. 1988) ("There is no order I can enter which erases from defendant's counsel's knowledge what has been disclosed."). Thus, the purpose of the work product doctrine, that "opposing counsel should not enjoy free access to an attorney's thought processes," *In re Steinhardt Partners, L.P.*, 9 F.3d 230, 234 (2d Cir.1993), has already been severely undermined. Moreover, although the Government insists that the situation can be contained and further damage avoided by maintaining the status quo, the dissemination of the Prosecution Memorandum to numerous unidentified shareholders, brokers, potential investors, and members of the public suggests otherwise.

Second, because two defendants and their counsel have seen the Prosecution Memorandum, the defendants who have not seen it argue that they have been deprived of a "level playing field" because they may suffer prejudice in their preparations for trial and/or plea negotiations. The Government argues that the "playing field" is never "even" in multiple defendant cases because of differences in resources, quality of counsel, and the like. While that may be true, the playing field in this case has been made significantly more uneven because of the Government's failure to take reasonable precautions. Hall and Kirkham alone are now aware of the Government's likely strategy at trial and the substance of the evidence that would be presented against all of the defendants. This knowledge gives Kirkham and Hall a significant advantage in a case where finger-pointing among defendants is likely to occur.

Third, much of the information contained in the Prosecution Memorandum will eventually be disclosed in any event. As two of the defendants have already seen it, as have many members of the public, it would not be unfair to require the Government to disclose the contents of the Prosecution Memorandum now.

Fourth, as the Government argues, in some sense disclosure of the Prosecution Memorandum now would result in defendants receiving a "windfall," as ordinarily they would not be entitled to the information until much later in the litigation, if at all. Nonetheless, the other considerations discussed above outweigh any unfairness in this respect.

Finally, although I am concerned about the premature disclosure of the identities of witnesses and victims, the Prosecution Memorandum can be redacted to minimize any risk of tampering. Counsel for Hall stated at oral argument that "we would have no objection to appropriate redactions." (3/17/97 Tr. at 32). Although it is unclear whether he was speaking for all defendants, no other defense counsel voiced any disagreement. Accordingly, appropriate redactions can be made before the Prosecution Memorandum is produced. I note also in this respect that the Government has taken precautions to reduce the risk of tampering.

On balance, the overreaching considerations of fairness weigh heavily in favor of a finding of waiver. For this reason as well as the other reasons discussed above, I hold that the Government has waived its claim of privilege to the Prosecution Memorandum.

### D. The Request for Relief Against the Government

■ Defendant Joseph Kirkham moves for an order compelling the Government to return to the Prosecution Memorandum that it removed from the court file. He also requests that the Court hold an evidentiary hearing to determine the facts surrounding the removal. Other defendants join in the contention that the Government acted improperly in retrieving the Prosecution Memorandum and draft indictment.

These contentions are rejected. The Assistants in question acted in a completely appropriate and responsible manner. They removed the Prosecution Memorandum and draft indictment from the court file at the direction of a supervisor and, more importantly, with the knowledge and consent of a member of the Clerk's Office of the Court. Speedy action was required, and speedy action was taken, with the approval of Court personnel.

There is no need for any further evidentiary hearing. The Court has possession of the "original" draft indictment that was removed from the court file. The Court will return it to the Government, and the Government is directed to preserve the "original" draft indictment as well as the "original" Prosecution Memorandum so that they will be available for appellate review.

### CONCLUSION

For the reasons set forth above, I hold that the Government has waived its claim of privilege to the Prosecution Memorandum. Accordingly, its motion for "return" of the Prosecution Memorandum is denied. The Government shall submit proposed redactions, which must be limited in scope, to the Court *in camera* by April 9, 1998. At the same time, the Government shall provide a letter to all defense counsel describing the proposed redactions. The Prosecution Memorandum shall be produced by the Government to all defendants promptly after the Court rules on the requested redactions. In addition, the Government shall advise the Court, also by April 9, 1998, whether it wishes to press its request for disqualification of counsel.[6]

SO ORDERED.

---

6. By letter dated March 19, 1998, Ivan K. Mathew, Esq., requested leave to withdraw from the case as Hall's attorney. I granted the request. Hall will continue to be represented by McGuire.