**UNITED STATES of America,**

v.

**John J. RIGAS, Timothy J. Rigas, Michael J. Rigas, and Michael C. Mulcahey, Defendants.**

No. 02 Cr. 1236(LBS).

United States District Court, S.D. New York.

Sept. 22, 2003.

Peter Fleming, Jr., Ben Preziosi, Jona-
than Harris, Curtis, Mallet–Prevost, Colt

& Mosle, New York City, for John J. Rigas.

Paul R. Grand, Jeremy Temkin, Morvillo, Abramowitz, Grand, Iason & Silberberg, New York City, for Timothy J. Rigas.

Andrew J. Levander, Kevin O'Brien, Adam Wasserman, Swidler, Berlin, Shereff, Friedman, New York City, for Michael J. Rigas.

Mark J. Mahoney, Harrington & Mahoney, Buffalo, New York, for Michael C. Mulcahey.

## OPINION

SAND, District Judge.

By letter dated July 25, 2003, Defendants John Rigas, Timothy Rigas, Michael Rigas, and Michael Mulcahey ("Defendants") applied for an order authorizing them to retain certain privileged documents contained on a computer hard drive that was produced to Defendants by the Government during discovery. (Court Ex. B, 7/30/03). For the reasons set forth below, Defendants' application is denied.

## I. Background

Defendants are charged with conspiracy, bank fraud, wire fraud, and securities fraud in connection with the management and control of Adelphia Communications Corporation ("Adelphia"). As part of its investigation, the Government issued Grand Jury subpoenas to Adelphia requesting documents (including those stored electronically) concerning a wide range of issues. In August 2002, Adelphia responded by producing, among other materials, exact copies of twenty-six computer hard drives used by Adelphia employees during the relevant time period. The copies were created by PriceWaterhouseCoopers ("PWC"), an accounting firm retained by Adelphia. The original hard drives remain with Adelphia in "pristine condition." (Tr. of Court Conference of 7/30/03, 7–8;

Affirmation of Christopher J. Clark, 8/11/03 ("Clark Aff.") ¶¶ 2–3). In October 2002, the Government informed defense counsel, by letter, that the Government possessed the Adelphia hard drives and indicated that it would make those drives available to defense counsel for copying. The Government insisted that it interview any vendor hired by defense counsel for this purpose. (Clark Aff. ¶ 4).

In December 2002, Assistant United States Attorneys ("AUSAs") Christopher Clark and Timothy Coleman, both assigned to the Adelphia matter, directed their Information Technology ("IT") staff to install the hard drives in certain computer terminals belonging to the United States Attorney's Office ("USAO"). The AUSAs informed the IT staff that the hard drives "were evidence" and should be installed in such a way as to prevent additions to or deletions from those drives. The hard drives were subsequently installed by James Miller ("Miller"), a USAO Computer Specialist, on a computer terminal in USAO office space at 26 Federal Plaza, a secure federal building. The computer was configured so that authorized persons could view documents on the Adelphia hard drives while in that space as well as access from that computer files on the USAO's computer network. In other words, the Adelphia hard drives themselves could only be viewed from that computer and could not be accessed through the USAO network by employees working in other locations. (Affirmation of Timothy J. Coleman, 8/11/03 ("Coleman Aff.") ¶ 2; Clark Aff. ¶¶ 6–7, 11; Affidavit of Margaret Lee, 8/11/03 ("Lee Aff.") ¶ 4; Affidavit of James Miller, 8/11/03 ("Miller Aff.") ¶¶ 12–13; Affidavit of Kurt Olander, 8/11/03 ("Olander Aff.") ¶¶ 3–5).

Following the installation of each Adelphia hard drive, Margaret Lee ("Lee"), a paralegal employed by the USAO who was

assigned to this and other cases, conducted a cursory review of the drive to confirm that it could be accessed. (Lee Aff. ¶ 6). AUSA Clark reviewed the drives for content on multiple occasions thereafter. (Clark Aff. ¶ 12).

On July 1, 2003, a computer consultant hired by defense counsel was permitted to make copies of the Adelphia hard drives at the main USAO office (One St. Andrew's Plaza) under the supervision of a USAO employee. The USAO maintained a log of all drives provided to the consultant for copying; AUSA Clark reviewed the log before permitting the consultant to leave the premises with images of the hard drives in hand. (Clark Aff. ¶ 16). On July 23, 2002, in the course of reviewing the images he had produced, defense counsel's computer expert discovered a chronology prepared by Lee. That document was located within a folder labeled "MLee" on the hard drive of former Adelphia employee James Brown. The following afternoon, Peter Fleming ("Fleming"), defense counsel for John J. Rigas, called AUSA Clark to advise him of this discovery. Fleming informed AUSA Clark that neither he nor any other individual at his law firm had read the chronology or any other USAO documents on the hard drive. (Clark Aff. ¶ 17).

AUSA Clark immediately directed Miller to review the Adelphia hard drives for evidence of Lee's files. Miller discovered that Lee's entire computer network account was copied on to one of the twenty-six hard drives. Her account includes Grand Jury material, confidential law enforcement information and her own work product relating not only to the Adelphia matter but to a number of other cases to which she is assigned. (Clark Aff. ¶ 18; Lee Aff. ¶ 7). Miller further determined that a directory with Lee's user name was present on a second Adelphia drive, but

concluded that no files had been copied into that directory. (Miller Aff. ¶ 18).

While it remains unclear precisely *when* the copying of Lee's files took place, the manner in which it occurred appears to have been as follows. Each USAO computer terminal contains a hard drive, which is divided into two "virtual" drives (the "c" and the "d" drives). The "d" drive is used for, among other things, storing a backup copy of files saved within the USAO network account of the computer's "designated user." The backup copy is generated by Peersync, a software utility, after the designated user logs on to the network. When Miller installed the Adelphia hard drive in question into the 26 Federal Plaza computer, he triggered, unbeknownst to him, a change in the way that computer's existing hard drive was partitioned. As a result, the Adelphia drive became the "d" drive and Peersync replicated the files of the designated user (Margaret Lee) on to that Adelphia drive rather than the computer's own existing hard drive. Although AUSA Clark also reviewed Adelphia hard drives on that computer, his files were never replicated by Peersync because he was not the computer's "designated user." (Miller Aff. ¶¶ 4–7, 15; Supplemental Affidavit of James Miller, 8/25/03 ("Miller Supp. Aff.") ¶ 3).

On July 24, 2003, the same day that it learned of the inadvertent disclosure of Lee's files, the Government sent a letter to defense counsel asserting the work product privilege with respect to those files and requesting their prompt return. (Court Ex. A, 7/30/03). Defense counsel declined to return the documents to the Government, but did agree to provide them to the Court pending resolution of this dispute. (Court Ex. B, 7/30/03).

## II. Discussion

As a preliminary matter, it should be noted that Defendants make no claim of spoliation with respect to the Adelphia hard drives. (Defendants' Letter to Court, 8/20/03, at 3–4; Defendants' Letter to Court, 9/9/03, at 1).[1] As such, the Court does not now reach any decision regarding the *admissibility* of those drives but rather limits the scope of this Opinion to the question whether Defendants may retain the privileged materials produced by the Government.

█ Defendants argue that the Government waived its work product privilege when it voluntarily permitted defense counsel to copy the James Brown hard drive containing Lee's computer network account. (Court Ex. B, 7/30/03).[2] The Government, in contrast, contends that disclosure of Lee's files was inadvertent and therefore did not constitute waiver of the privilege. (Government's Letter to Court, 8/11/03). As a general rule, the voluntary production of a privileged document waives any claim of privilege with respect to that document. *See e.g., United States v. Gangi,* 1 F.Supp.2d 256, 263 (S.D.N.Y.1998) ("Even privileged documents ... are not protected if a party voluntarily discloses them."). However, courts are divided among three schools of thought when it comes to waiver through inadvertent disclosure. *See Asian Vegetable Research and Development Center v. Institute of International Education,* 1995 WL 491491, at *6–7, 1995 U.S. Dist. LEX-

IS 11776, at *19–21 (S.D.N.Y. August 17, 1995) (laying out the three schools of thought); *Weinstein's Federal Evidence* § 503.42[2]-[4] (1997) (same).

On one end of the spectrum, the strict approach holds that the voluntary production of any document — whether intentional or accidental — results in waiver. *See e.g., FDIC v. Singh,* 140 F.R.D. 252, 253 (D.Me.1992) ("[W]hen a document is disclosed, even inadvertently, it is no longer held in confidence despite the intentions of the party.... One cannot 'unring' a bell."); *In re Sealed Case,* 877 F.2d 976, 980 (D.C.Cir.1989) ("[I]f a client wishes to preserve the privilege, it must treat the confidentiality of attorney-client communications like jewels — if not crown jewels."). On the other end of the spectrum, the lenient view takes the position that inadvertent production of a privileged document *never* constitutes waiver because the "lawyer-client privilege exists for the benefit of the client and cannot be waived except by an intentional and knowing relinquishment." *Weinstein's Federal Evidence* § 503.42[2]. *See e.g., United States v. Zolin,* 809 F.2d 1411, 1417 (9th Cir. 1987), *aff'd in part, vacated in part on other grounds,* 491 U.S. 554, 109 S.Ct. 2619, 105 L.Ed.2d 469 (1989) (delivery of tapes that counsel believed were blank was inadvertent and therefore could not constitute waiver).

█ This District, in contrast, has adopted the "middle of the road" approach

---

1. After discovering that alterations took place on two of the drives that it had produced, the Government provided to defense counsel new imaged copies of those drives, taken from the pristine versions maintained by Adelphia. (Clark Supp. Aff. ¶ 4). Defendants declined the opportunity to compare the new copy of the James Brown hard drive with the drive originally produced by the Government so that they might determine if, other than the addition of the Lee files, properties of the

drive had been altered. (Defendants' Letter to Court, 9/9/03, at 1).

2. Defendants accept the Government's assertion that all documents inadvertently produced on the hard drives in question are Margaret Lee's work product and that such documents were privileged prior to any alleged waiver. (Defendants' Letter to Court, 8/20/03, at 3 n. 1).

to waiver of the privilege through the inadvertent disclosure of protected documents. *See e.g., United States v. Gangi,* 1 F.Supp.2d 256, 264 (S.D.N.Y.1998) ("[T]he prevailing view in this District, as well as in the majority of the Circuits, is that a more flexible, 'middle of the road approach' should be applied."). Under this flexible test, courts are called on to balance four relevant factors: (1) the reasonableness of the precautions taken by the producing party to prevent inadvertent disclosure of privileged documents; (2) the volume of discovery versus the extent of the specific disclosure at issue; (3) the length of time taken by the producing party to rectify the disclosure; and (4) the overarching issue of fairness. *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.,* 104 F.R.D. 103, 105 (S.D.N.Y.1985).

As Judge Sweet observed in *Asian Vegetable Research and Development Center v. Institute of International Education,* 1995 WL 491491, 1995 U.S. Dist. LEXIS 11776 (S.D.N.Y. August 17, 1995), "[t]his rule best reconciles the principles underlying the attorney-client privilege with the realities of the discovery process in complex litigation." *Id.,* 1995 WL 491491, at *7, 1995 U.S. Dist. LEXIS 11776, at *21. *See also Gangi,* 1 F.Supp.2d at 264 ("Although this rule recognizes that mistakes will be made . . . , it also creates an incentive for counsel to guard the privilege closely.")

### A. Reasonableness of Precautions Taken by the Government

 Generally, courts in this District will not find waiver by inadvertent disclosure unless the producing party's actions were "so careless as to suggest that it was not concerned with the protection of the asserted privilege." *Aramony v. United Way of America,* 969 F.Supp. 226, 235 (S.D.N.Y.1997). This standard was stated perhaps more precisely by Judge Kaplan in *SEC v. Cassano,* 189 F.R.D. 83 (S.D.N.Y.1999), where he wrote, "The same point might more accurately be put in terms of whether the party producing privileged material has been so careless as to surrender any claim that it has taken reasonable steps to ensure confidentiality." *Id.* at 85 n. 4.

Here, the Court is satisfied that the Government took sufficient steps to ensure the confidentiality of Lee's work product. Lee's files were maintained on the USAO's secure computer network, which may be accessed only by authorized individuals who have obtained security clearance. (Miller Aff. ¶ 3). Further, her work was stored within a private, password-protected account on that network, meaning that only she could access her files. (Lee Aff. ¶¶ 6, 9). Moreover, the vendor hired by Defendants to copy the Adelphia hard drives at the USAO's main office was prohibited from accessing the USAO network and was supervised by a USAO employee throughout the duration of the visit. (Clark Aff. ¶ 16).

In addition, the Government took reasonable precautions to protect the integrity of the Adelphia hard drives themselves. The drives were stored in USAO office space that sits within a secure federal building. Access to that office space is restricted to a single door that opens only in response to a computer-coded swipe card. Even inside that office space, further security measures exist. Two locked offices are maintained exclusively for the Adelphia matter, and the door to each bears a sign limiting access to authorized individuals and indicating that confidential materials are stored within said office. (Clark Aff. ¶¶ 9–10).

The AUSAs assigned to the Adelphia case recognized the limits of their own technical knowledge and recruited the assistance of their IT staff in the installation of the Adelphia hard drives. The AUSAs

provided specific instructions to IT staff members that the drives should be installed in such a way as to prevent additions to or deletions from those drives. They emphasized that the drives were evidence in a criminal matter and that copies of them would be provided to the defense. Lacking the necessary expertise themselves, the legal team relied in good faith on the assurances of IT personnel that the hard drives could be viewed without the risk of alteration. Moreover, the IT staff themselves believed that the drives were safe from the addition or deletion of files as installed, and did not anticipate the replication of an entire user network account on to an Adelphia drive, as occurred in this case. (Coleman Aff. ¶¶ 2–4; Clark Aff. ¶¶ 6–7; Olander Aff. ¶¶ 3–5).

Further, when it came time for defense counsel's consultant to copy the hard drives at the USAO's main office, the Government took additional steps to prevent the disclosure of privileged materials. These precautions included an interview with the consultant regarding the security measures employed by his firm, as well as the creation of a log that recorded all drives provided to the consultant during his visit. AUSA Clark reviewed that log to ensure that only Adelphia hard drives were copied. (Clark Aff. ¶¶ 4 n. 1, 16).

■ With the benefit of hindsight, it now appears that the Government could have avoided the inadvertent disclosure of USAO work product by producing a "pristine" version rather than a working copy of the Adelphia hard drives to defense counsel's computer consultant. (*See* Affidavit of Paul J. Neale, Jr., 8/20/03, ¶¶ 20–23). Nonetheless, this Court emphasizes that the reasonableness of a party's actions to protect privileged information should be measured in light of the risks *foreseeable* to that party at the time the precautions were taken. The mere fact of an accidental disclosure does not automatically render the precautionary measures unreasonable at the time they were performed. *Prescient Partners, L.P. v. Fieldcrest Cannon, Inc.*, 1997 WL 736726, at *5, 1997 U.S. Dist. LEXIS 18818, at *14 (S.D.N.Y. November 26, 1997) ("The fact of disclosure does not necessarily mean that the precautions were unreasonable.").

According to Defendants' expert, Paul Neale, the addition of files to the Adelphia hard drives was a "clearly foreseeable" risk of installing those drives into a computer connected to the USAO network. (Neale Aff. ¶ 27). Nonetheless, Neale also testified that he had never witnessed such an occurrence in all his years of experience with technology-based litigation services: "I have not seen specifically where files were copied to a hard drive through this circumstance." (Tr. of Evidentiary Hearing, 9/8/03, 43). In fact, no one at trial had previously experienced such an occurrence. Given the unique nature of this event, it cannot be said that the Government should have foreseen it.

In this regard, Defendants rely on *SEC v. Cassano*, 189 F.R.D. 83 (S.D.N.Y.1999), to argue that the Government ignored "red flags" raised by defense counsel regarding the possibility that the drives had been corrupted. In *Cassano*, Judge Kaplan held that the Securities and Exchange Commission ("SEC") waived the work product privilege when it accidentally produced to defense counsel an internal action memorandum drafted by SEC staff along with some fifty boxes of documents. *Id.* at 85–86. Per an agreement between the parties, the SEC made all documents it produced available for inspection by defense counsel in the SEC's New York Regional Office. *Id.* at 84. Defense counsel was to identify any documents it wished to have copied and the SEC consented to copy such documents at the end of the agreed-upon review period. *Id.*

Early on in the inspection period, defense counsel discovered the memorandum in question, and requested that an SEC paralegal copy it immediately. *Id.* The paralegal telephoned the SEC's lead counsel to obtain clearance. *Id.* The attorney who received the call did not review his own copy of the memorandum before authorizing the paralegal to provide a copy to the defense. *Id.* at 84–85. The Court concluded that "[a]ny attorney faced with such a request in comparable circumstances should have reviewed the document immediately, if only to find out what the other side thought so compelling." *Id.* at 85. Defendants argue that the present case is similar to *Cassano* because defense counsel asked the Government a number of questions related to the forensic soundness of the hard drives, raising a "red flag" that the Government's manner of handling the drives risked the type of alteration that ultimately occurred in this case. (Defendants' Letter to Court, 8/20/03, at 13–15).[3]

The Court finds *Cassano* distinguishable from the present case. There, defense counsel expressed immediate and specific interest in a single document produced by the SEC, and the SEC attorney failed to take the minimal step of pulling the document from his files to determine whether it contained privileged information. *Id.* at 84–85. Here, defense counsel's questions were not nearly as focused, but rather were aimed generally at understanding the nature of the hard drives possessed by the Government. Defense counsel's inquiries made no reference to the risk that files might be added to the Adelphia hard

drives, and their questions would not reasonably have triggered concerns beyond those that the AUSAs believed they had already addressed in their instructions to the IT staff.

The Court concludes that this factor tips against a finding of waiver in the present case.

**B. Scope of Discovery Versus Extent of Disclosure**

█ Courts generally decline to find waiver when "a relatively small number of privileged documents were disclosed in comparison to the total number of documents produced." *Asian Vegetable Research and Development Center v. Institute of International Education,* 1995 WL 491491, at *7, 1995 U.S. Dist. LEXIS 11776, at *23 & n. 6 (S.D.N.Y. August 17, 1995) (finding twenty pages of inadvertently disclosed documents a "relatively small" number relative to the total of 75,000 pages produced). *See also Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.,* 104 F.R.D. 103, 105 (S.D.N.Y.1985) (holding that no waiver occurred when twenty-two protected documents were accidentally produced out of a total of 16,000 pages reviewed). This factor recognizes the reality that "it is virtually impossible to avoid any error whatsoever in dealing with large volumes" of discovery materials. *Cassano,* 189 F.R.D. at 86.

Given the complexity of the Adelphia matter, the overall volume of discovery documents produced by the Government is tremendous, including hundreds of thousands of pages of paper documents, hun-

---

3. Defense counsel's inquiries included the following questions:

(1) Do the 26 drives represent: (a) The actual hard drives? (b) An "image" of the actual hard drives? or (c) A manual copying of files from the actual hard drives to new hard drives?

(2) As of what date was the data from these hard drives captured?

(3) If the 26 drives were imaged, what software was used for this purpose?

(4) If the 26 copies were manually copied to a new hard drive, what software was used? Were all files copied?

(Court Ex. B, 7/30/03, Attachment).

dreds of CD ROMs, and, of course, the Adelphia hard drives. (Government's Letter to Court, 8/11/03, at 8 (citing Affidavit of Paul R. Grand, Esq., 3/10/03, ¶ 14)). In contrast, the inadvertent production of the "MLee" folder amounted to the disclosure of roughly 130 files (Lee Aff. ¶ 7), a small fraction of the total number of materials produced. Defendants argue that the extent of the "MLee" disclosure should be measured against the specific production of the twenty-six hard drives, rather than the overall volume of discovery produced by the Government in this case. (Defendants' Letter to Court, 8/20/03, at 15 n. 4). However, even accepting that premise, the Court finds Defendants' position unconvincing. Each of the twenty-six hard drives possesses a data capacity of 11.2 gigabytes, which translates into approximately two million pages per drive. (Miller Aff. ¶ 12). Thus, under either formulation, this factor weighs against a finding of waiver.

### C. Time Taken by the Government to Rectify the Error

■ "Inadvertent disclosure has been held to be remedied when the privilege is asserted immediately upon discovery of the disclosure and a prompt request is made for the return of the privileged documents." *Liz Claiborne, Inc. v. Mademoiselle Knitwear, Inc.*, 1996 WL 668862, at *5, 1996 U.S. Dist. LEXIS 17094, at *12 (S.D.N.Y. November 19, 1996). Here, the Government was first made aware that it had inadvertently produced Lee's files when AUSA Clark received a phone call to that effect from Fleming on July 24, 2003. That same day, the Government sent to defense counsel a letter (copied to the Court) asserting the work product privilege with respect to Lee's files, and seeking the return of any hard drives containing those files, along with any documents or information derived from them. Further, the Government requested that, in

the interim, defense counsel refrain from reviewing any material on those drives. The Government agreed to produce replacement copies of the hard drives in question at its own expense and did so promptly. (Court Ex. A, 7/30/03; Supplemental Affidavit of Christopher J. Clark, 8/25/03 ("Clark Supp. Aff.") ¶ 4).

On July 25, 2003, the Government sent a second letter to defense counsel reasserting the privilege and confirming its understanding that all copies of Lee's files would be provided to the Court on that date. (Court Ex. C, 7/30/03). The Government further defended its position at a subsequent conference and evidentiary hearing held by this Court. In light of the Government's prompt and sustained efforts to rectify its error, the Court is convinced that this factor clearly weighs against a finding of waiver.

### D. Fairness

■ Generally, courts hold that fairness dictates a finding of waiver in cases where the privileged information at issue has been widely disseminated. For example, in *United States v. Gangi*, 1 F.Supp.2d 256 (S.D.N.Y.1998), a 69–page memorandum created by the USAO was accidentally attached to the back of a 75–page draft indictment. *Id.* at 259. Together, the two documents were handed to the judge at the defendant's presentment, "publicly filed and widely distributed." *Id.* at 267. In such an instance, "the purpose of the work product doctrine, that 'opposing counsel should not enjoy free access to an attorney's thought processes,' has already been severely undermined," thereby supporting a finding of waiver. *Id.* (*quoting In re Steinhardt Partners, L.P.*, 9 F.3d 230, 234 (2d Cir.1993)). Fairness concerns are especially salient when some parties have reviewed the information while others have not. As the court held in *Cassano*,

"there would be little equity in some defendants going forward with the benefit of counsel who have read the [SEC] memorandum while others do not." *SEC v. Cassano*, 189 F.R.D. 83, 86 (S.D.N.Y.1999).

There is no such risk of prejudice in the present case. All defense counsel have refrained from reviewing Lee's work product pending resolution of this discovery dispute. (Clark Aff. ¶ 17). As a result, the purpose of the work product privilege has not been undermined and no one defendant will be prejudiced vis-à-vis any other defendant should the privileged documents in question be returned to the Government.

Defendants argue that this position punishes them for promptly notifying the Government that privileged documents were produced and for declining to review those materials pending resolution of this dispute. (*See* Defendants' Letter to Court, 8/20/03, at 15–16). In particular, Defendants raise the policy question, "why should attorneys follow their ethical obligations if it's going to be held against them?" (Tr. of Oral Argument, 9/3/03, 27).

The Court finds this argument wholly unpersuasive. Attorneys, of course, bear responsibility for acting in accordance with ethical norms of the legal profession, independent of any incentives or disincentives created by this fourth prong of the test for waiver. *See e.g.,* Am. Bar Ass'n Standing Comm. on Ethics and Prof. Resp., Formal Op. 92–368 (1992) ("A lawyer who receives materials that on their face appear to be subject to the attorney-client privilege or otherwise confidential, under circumstances where it is clear they were not intended for the receiving lawyer, should refrain from examining the materials, notify the sending lawyer and abide the instructions of the lawyer who sent them."). One would expect nothing less. Moreover, prior to the Government's "isolated, inad-

vertent error," *Aramony v. United Way of America,* 969 F.Supp. 226, 237 (S.D.N.Y. 1997), Defendants were not entitled to the work product contained within Lee's account. By restoring the privilege as to these documents, the Court takes nothing away from Defendants, but rather prevents a "windfall" to them.

One final consideration bears mentioning. Courts in this district have expressed reservations regarding findings of waiver in cases where disclosure could place victims and witnesses at risk. *See e.g., Gangi,* 1 F.Supp.2d at 267. *Cf. Cassano,* 189 F.R.D. at 86 ("[T]he SEC has not suggested that the safety or privacy of any witness would be compromised in any serious way absent the relief it seeks"). Such concerns are legitimately present here with regard to Grand Jury witnesses identified in the materials contained within Lee's files.

Taken together, the above considerations persuade the Court that fairness does not require but rather precludes a finding of waiver.

## III. Conclusion

For the foregoing reasons, Defendants' application is DENIED.

SO ORDERED.