**BUSINESS INTEGRATION SERVICES, INC., Plaintiff,**

v.

**AT & T CORP., Defendant.**

**No. 06 Civ. 1863(JGK)(MHD).**

United States District Court,
S.D. New York.

April 22, 2008.

Michael Einbinder, Einbinder & Dunn, LLP, New York, NY, Shawn Mitchell Perry, Perry, Perry & Perry, Minneapolis, MN, for plaintiff.

Sarah E. O'Connell, Fulbright & Jaworski L.L.P., New York, NY, Suzanne L. Montgomery, Bedminster, NJ, for defendant.

### MEMORANDUM & ORDER

MICHAEL H. DOLINGER, United States Magistrate Judge.

The present discovery dispute comes to us on remand from the District Court. By Memorandum Opinion and Order of November 2, 2007, Judge Koeltl vacated the portion of our August 21, 2007 Memorandum and Order that found a waiver of the attorney-client privilege by defendant AT & T Corporation as a consequence of disclosure to plaintiff of a substantial part of the substance of the attorney's communications by Mr. James Glackin, an AT & T regional manager. The reason for the vacatur was that Mr. Glackin's authority to waive the privilege on behalf of the defendant could not be sufficiently established on the basis of the record. The issue was therefore remanded for the specific purpose of determining Mr. Glackin's authority to do so.

Following a telephone conference with the Court on November 27, 2007, both parties submitted memoranda of law and declarations by their lawyers with exhibits. The new information provided on remand consists of a declaration by Mr. Jeffrey Quinn, an Executive Director in the Indirect Sales business unit of AT & T to whom Mr. Glackin reported (Decl. of Judith A. Archer Ex. A, Nov. 28, 2007) and excerpts of a deposition of Mr. James Glackin on October 27, 2007. (Aff. of Shawn M. Perry Ex. 5, Nov. 27, 2007).

For the reasons noted below, we find that the disclosures by Mr. Glackin indeed result in a waiver of the attorney-client privilege, and we order disclosure of certain privileged documents by defendant.

### I. *The Issue*

The undisputed facts that underlie this discovery dispute are—briefly stated and to the extent relevant—that a contractual relationship existed between AT & T and BIS, whereby BIS sold AT & T services to third parties. In 2004, AT & T decided to terminate this contractual relationship. During the relationship, Mr. Glackin was engaged in day-to-day contact with BIS on behalf of AT & T. Mr. Glackin also communicated with BIS about concerns AT & T had about the relationship, which concerns were cited by AT & T as a reason to terminate the contract. These concerns were—at least in part—of a legal or regulatory nature.

In the context of his communications with BIS, Mr. Glackin informed BIS not only that AT & T's corporate counsel had looked into the matter and what corporate counsel's conclusions were, but also disclosed (at least part of) the thought process of the attorney. This disclosure, together with several others mentioned in our August 21, 2007 Memorandum and Order at 9, formed the basis for a finding that a waiver of the attorney-client privilege had occurred. Given the context of the disclosure (extra-judicial rather than judicial), we concluded that the waiver was limited in scope and was not a broad subject-matter waiver. (*See* Mem. and Order at 10, Aug. 21, 2007). As mentioned, the question remains whether Mr. Glackin had the authorization to effect a waiver of the attorney-client privilege.

The starting point of our analysis of this issue is that the privilege lies with the client, in this case AT & T, and that it is therefore for AT & T to waive this privilege or not. *See Upjohn Co. v. United States,* 449 U.S. 383, 389–90, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981) (privilege applies to corporations) (citing *United States v. Louisville & Nashville R.R. Co.,* 236 U.S. 318, 336, 35 S.Ct. 363, 59 L.Ed. 598 (1915)); *Chirac v. Reinicker,* 11 Wheat. 280, 24 U.S. 280, 294, 6 L.Ed. 474 (1826) (privilege "is not that of the attorney, but of the client"); In re von Bulow, 828 F.2d

94, 100 (2d Cir.1987) ("[P]rivilege belongs solely to the client and may only be waived by him."). Since AT & T is a corporate entity, the decision to waive or not waive the privilege must be made by the company's appropriate representatives. As the Supreme Court recognized:

As an inanimate entity, a corporation must act through agents. A corporation cannot speak directly to its lawyers. Similarly, it cannot directly waive the privilege when disclosure is in its best interest. Each of these actions must necessarily be undertaken by individuals empowered to act on behalf of the corporation. . . .

The parties in this case agree that, for solvent corporations, the power to waive the corporate attorney-client privilege rests with the corporation's management and is normally exercised by its officers and directors.

*Commodity Futures Trading Comm'n v. Weintraub,* 471 U.S. 343, 348, 105 S.Ct. 1986, 85 L.Ed.2d 372 (1985).

The parties are in agreement that at the relevant time, Mr. Glackin did not occupy a position within AT & T that would normally empower him to decide to waive the company's attorney-client privilege: he was neither an officer or director of the company, nor a high-level manager. (Pl.'s Mem. of Law on Remand 2, Def.'s Mem. of Law on Remand in Further Opp'n to Pl's Mot. to Compel Disclosure 4.) The parties disagree, however, as to whether the circumstances of the case are such that Mr. Glackin's disclosure of the supposedly privileged information can lead to a waiver of AT & T's privilege.

## II. *Waiver Principles*

■ Preliminarily, we note that it is well established that "[t]he burden of establishing the existence of an attorney-client privilege, in all of its elements, rests with the party asserting it." *United States v. Int'l Bhd. of Teamsters,* 119 F.3d 210, 214 (2d Cir.1997). "The party claiming the privilege has the burden of showing 'that the communications between client *and attorney were made in confidence and have been maintained in confidence.'" Denney v. Jenkens & Gilchrist,* 362 F.Supp.2d 407, 412 (S.D.N.Y.2004)

(quoting *In re Horowitz,* 482 F.2d 72, 81–82 (2d Cir.1973)) (emphasis added in *Denney*).

■ In this case, we are faced with the fact that a disclosure of the privileged information has in fact taken place, thus destroying the confidentiality of the attorney-client communication involved. In the context of such a disclosure, "[i]t is . . . [the privilege-claiming party]'s burden to show that its privilege was not waived through disclosure to [the opposite party]." *Id.*

To determine the legal consequences of the disclosure in this case, we distinguish two scenarios: (1) a voluntary disclosure, that is, a disclosure to which AT & T consented either explicitly or implicitly, and (2) an involuntary disclosure, that is, a disclosure that took place against AT & T's will.

■ Voluntary disclosure will generally trigger a waiver of the attorney-client privilege. *See In re Steinhardt Partners, L.P.,* 9 F.3d 230, 234 (2d Cir.1993) ("Once a party allows an adversary to share the otherwise privileged thought processes of counsel, the need for the privilege disappears."). The consequences of an involuntary disclosure are more equivocal and depend on a number of factors, which will be discussed below.

## III. *Voluntary disclosure*

We first address the scenario of voluntary disclosure. In doing so, we are again faced with the circumstance that AT & T is a corporate entity, so that its consent has to be assessed by the actions of its corporate representatives.

Under general principles of corporate agency, we must take into account that a company's corporate officers do not need to be personally involved in all legally relevant actions of the company, but that they may, by specific power of attorney, authorize other persons to take specific actions on behalf of the company, thus providing those individuals with "actual authority". *Cf. Restatement (Third) of Agency,* § 3.01 (2006) ("the Restatement") (actual authority is created by a principal's manifestation to an agent that ex-

presses the principal's assent that the agent take action on the principal's behalf).[1]

Moreover, actions by persons acting without the proper prior authority of the corporation may sometimes be imputed to the company. This can be the case in particular when the company makes a "manifestation that [the actor] has authority to act with legal consequences for the [company], when a third party reasonably believes the actor to be authorized and the belief is traceable to the manifestation," resulting in the agent's "apparent authority". *Restatement* § 3.03; *accord, e.g., Minskoff v. Am. Express Travel Related Servs. Co., Inc.,* 98 F.3d 703, 708 (2d Cir.1996) ("Apparent authority is 'entirely distinct from authority, either express or implied,' . . . and arises from the 'written or spoken words or any other conduct of the principal which, reasonably interpreted, causes [a] third person to believe that the principal consents to have [an] act done on his behalf by the person purporting to act for him'" (quoting the *Restatement (Second) of Agency* § 8 cmt. a & § 27 and citing *Fennell v. TLB Kent Co.,* 865 F.2d 498, 502 (2d Cir.1989)).); *Musket Corp. v. PDVSA Petroleo, S.A.,* 512 F.Supp.2d 155, 161 (S.D.N.Y. 2007); *Vacura v. Haar's Equip., Inc.,* 364 N.W.2d 387, 391 (Minn.1985) (apparent authority is usually based on some affirmative action on the part of the principal but may also be found when principal tacitly sanctions continuance of an agent's regular exercise of power of which it is aware).

Similarly, the company can also ratify acts by an unauthorized actor after the fact:

(1) Ratification is the affirmance of a prior act done by another, whereby the act is given effect as if done by an agent acting with actual authority.

(2) A person ratifies an act by

(a) manifesting assent that the act shall affect the person's legal relations, or

(b) conduct that justifies a reasonable assumption that the person so consents.

*Restatement* § 4.01; *accord, e.g., Chem. Bank v. Affiliated FM Ins. Co.,* 196 F.3d 373, 375 (2d Cir.1999) (ratified act is given effect as if originally authorized (citing *Holm v. C.M.P. Sheet Metal, Inc.,* 89 A.D.2d 229, 232, 455 N.Y.S.2d 429, 432 (4th Dep't 1982) and *Leviten v. Bickley, Mandeville & Wimple, Inc.,* 35 F.2d 825, 827 (2d Cir.1929))), *vacated on other grounds sub nom. Chase Manhattan Bank v. Affiliated FM Ins. Co.,* 343 F.3d 120 (2nd Cir.2003); *Anderson v. First Nat'l Bank of Pine City,* 303 Minn. 408, 410, 228 N.W.2d 257, 259 (1975) ("Ratification occurs when one, having full knowledge of all the material facts, confirms, approves, or sanctions, by affirmative act or acquiescence, the originally unauthorized act of another." (citing *Fox v. Morse,* 255 Minn. 318, 96 N.W.2d 637 (1959), and *Strader v. Haley,* 216 Minn. 315, 12 N.W.2d 608 (1943))).

A manifestation by a company that leads to the apparent authorization of the actor or that affirms his actions after the fact does not need to be explicit. "Silence may constitute a manifestation when, in light of all the circumstances, a reasonable person would express dissent to the inference that other persons will draw from silence. Failure then to express dissent will be taken as a manifestation of affirmance." *Restatement* § 1.03 cmt. b; *accord, e.g., IBJ Schroder Bank & Trust Co. v. Resolution Trust Corp.,* 26 F.3d 370, 375 (2d Cir.1994) ("Ratification also may be found to exist by implication from a principal's failure to dissent within a reasonable time after learning what had been done. 'If a corporation acquires or is charged with knowledge of an unauthorized act undertaken by someone on its behalf, and does not repudiate that act within a reasonable time, but instead acquiesces in it, the corporation is bound by the act.'" (quoting *In re Martin–Trigona,* 760 F.2d 1334, 1341 (2d Cir.1985))); *United States v. Fulcher,* 188 F.Supp.2d 627, 637 (W.D.Va.2002) ("affirmative acts of the principal are not required . . . since 'knowledge of, and acquiescence in, the agent's acts may be enough and may even rest in infer-

1. We cite to the most recent, third *Restatement of Agency* (2006) here. It should be noted that even though the *Restatement (Second)* did not deal explicitly with corporate agency, the *Restatement* provisions cited do not substantively differ from

their predecessors in the *Restatement (Second)*. *See Restatement (Third) of Agency* Introduction 11 (Reporter's Notes, Comparison with *Restatement Second, Agency*).

ence if the agent's course of dealing has been for such time and of such character as to justify the inference'" (quoting 2A C.J.S. *Agency* § 155)); *Anderson,* 303 Minn. at 410, 228 N.W.2d at 259 (ratification occurs by affirmative act or by acquiescence).

Applying these principles to the present case, we must assess whether AT & T either (1) provided Mr. Glackin with actual authorization to act on the company's behalf, (2) made a manifestation before the act of disclosure, "through written or spoken words or other conduct," *Restatement* § 1.03, which may have led third parties to "reasonably believe[ ] [that] the actor [was] authorized," *id.* § 3.03, or (3) engaged in conduct after the act of disclosure that "justifies a reasonable assumption" that AT & T "assent[ed] that the act shall affect [its] legal relations." *Id.* § 4.01.

In their briefs, the parties discuss two possible reasons to impute the disclosure to AT & T. First, BIS argues that Mr. Glackin was acting under the direction of AT & T's corporate counsel when making the disclosure and that this would constitute either actual or apparent authority to make that disclosure. (Pl.'s Mem. of Law on Remand 2.) Second, the parties debate whether "any [AT & T] supervisor, attorney or other corporate management employee was aware [of the disclosure] and acquiesced." (Pl.'s Mem. of Law in Opp'n to Def.'s Objections to the Aug. 21, 2007 Mem. and Order 13.)

We will deal with each argument in turn.

## A. *Prior (actual or apparent) authorization*

█ We do not find BIS' first argument convincing. To find Mr. Glackin's authority to make the disclosure, BIS relies on the fact that AT & T's privilege log shows that there were "numerous e-mails in which [the corporate counsel], Glackin and high level executives were communicating about the ABN business model" (Pl.'s Mem. of Law on Remand 2) and that Mr. Jeffrey Quinn, to whom Mr. Glackin reported, testified that in-house counsel "direct[ed]" Mr. Glackin. (*Id.*)

AT & T argues that the direction that Mr. Glackin received from in-house counsel pertained only to the termination of the contractual relationship with BIS and not to the disclosure of privileged information to BIS. The plain language of Mr. Quinn's deposition testimony and his supplemental declaration are consistent with AT & T's position. At his deposition, Mr. Quinn testified as follows:

"Q. In this February 2004 time frame, did you ask any—order any of your subordinates to tell BIS to stop selling ABN services?

A. No.

Q. Did anybody else to your knowledge?

A. I believe so.

Q. And who would that have been?

A. The counsel that was directing Jim [Glackin] at this time."

(Perry Aff. Ex. 1 (Deposition of Jeffrey Quinn, May 23, 2007 at 69:17–70:3), Nov. 27, 2007). This testimony does not indicate that corporate counsel directed Mr. Glackin as to the extent to which he could disclose to BIS the contents of counsel's advice. Significantly, Mr. Quinn subsequently declared that his testimony "in no way meant that [the counsel] had directed Mr. Glackin to disclose privileged communications." (Archer Decl. Ex. A ¶ 10, Nov. 28, 2007.)

Moreover, contrary to what BIS argues, AT & T's privilege log does not contain references to communications between Mr. Glackin and in-house counsel around the time that Mr. Glackin made the initial disclosures—March 18 and 27, 2004—that might indicate that there were discussions about the contents of Mr. Glackin's e-mails. (*See* Perry Aff. Ex. 2, Nov. 27, 2007.) There is no indication that drafts were circulated or that counsel commented on Mr. Glackin's e-mails. On the contrary, Mr. Glackin testified during his deposition as follows:

Q. Now, when you communicated with BIS, did you summarize the concerns that legal had or did you repeat in detail what was told to you by AT & T's lawyers?

A. I probably summarized.

(. . .)

Q. And before you had those conversations with BIS, no AT & T lawyer told you, you know, go ahead, repeat to BIS what I told you?

A. Nor did they tell me not to.

(*Id.* Ex. 5 (Deposition of James Glackin, Oct. 29, 2007 at 287:2–6, 12–15)).

This evidence is insufficient to find actual authority (*i.e.*, that AT & T authorized Mr. Glackin to act on its behalf in making the disclosure). There is nothing in the record that supports such a direct authorization. On the contrary, various witnesses have testified that Mr. Glackin did not receive specific instructions to disclose this information from anyone. (*See* Archer Decl. Ex. A ¶ 10; Glackin Decl. Ex. A ¶¶ 8–10.)

This evidence also does not support a finding of apparent authority. Apparent authority requires that BIS have had a reasonable belief that Mr. Glackin was authorized to make the disclosure on behalf of the company and that that belief was traceable to a prior manifestation by the company that was reasonably adequate to create that belief. We do not identify in the record any manifestation by AT & T to BIS that would justify the belief that AT & T had authorized Mr. Glackin to make the disclosures.[2]

## B. *Ratification*

█ We then turn to BIS' second argument, that AT & T acquiesced in the disclosure of the privileged information by Mr. Glackin. We find this argument convincing.

The record shows the following facts that are relevant in this context:

-Before Mr. Glackin communicated with BIS about counsel's advice, he indicated to counsel that he would be discussing "the situation" with BIS:

Q. And before you had those conversations with BIS, no AT & T lawyer told you, you know, go ahead, repeat to BIS what I told you?

A. Nor did they tell me not to.

Q. Did you indicate to them that you would be communicating to BIS about their advice?

A. Absolutely, told AT & T corporate couple [sic] that I had a conversation with BIS about the situation.

(Perry Aff. Ex. 5 (Glackin Dep. at 287:12–20.), Nov. 27, 2007)

-On March 18, 2004, Mr. Glackin sent an e-mail to BIS which contains the following passage:

Our corporate attorney has concluded, among other things, as long as BIS uses Business Direct to grant the end users access to their billing and support, this model constitutes "utilizing the AT & T brand" and BIS is not authorized to use the brand for reselling services. The thought process is that Business Direct has the AT & T brand all over it and this can cause confusion and could violate truth in billing requirements.

(Aff. of Shawn M. Perry Ex. 3 at ATT000743, Aug. 10, 2007.)

-On March 27, 2004, Mr. Glackin sent another e-mail to BIS, which includes the March 18, 2004 e-mail, and states: "One of the issues specific to BIS being paid on this ABN revenue is that BIS is the customer of record. An AT & T Corporate Attorney has ruled that paying BIS commissions on these services would be in violation of the tariffs." This e-mail concludes with: "Because BIS has included their attorney in this e-mail, I have added AT & T Corporate Counsel to my response and will at this point have no further communication with BIS regarding this issue. Please direct all further communication to our Corporate Counsel." (Perry Aff. Ex. 3 at ATT000742, Aug. 10, 2007).

-There is no indication in the record that AT & T asserted at the time or reasonably soon thereafter that these e-mails contained privileged information which should not have been disclosed to BIS or that AT & T took any steps to undo the disclosures made in these e-mails.

-Only when BIS requested, three years later, that certain documents on AT & T's privilege log be made available to it in the context of discovery, did AT & T raise the issue of legal privilege as to the contents of the discussions that Mr. Glackin had with BIS about the advice that he had received from AT & T's corporate counsel.

---

**2.** Plainly, Mr. Glackin's own communications cannot serve as such.

-During a deposition on October 29, 2007 (*i.e.*, after our previous Memorandum and Order on this issue), Mr. Glackin gave the following answers to questions asked by AT & T's own attorney:

Q. Were the concerns that you were aware of that were expressed by AT & T's law department and ultimately led to the determination to instruct BIS not to sell under the ABN, legal concerns?

A. The concerns I had?

Q. No, the concerns that AT & T's law department expressed, were they legal concerns?

A. I don't believe so.

Q. Did they have to do with regulatory matters?

A. To a small degree.

Q. Did they have to do with concerns about compliance with certain laws?

A. To a small degree.

(Perry Aff. Ex. 5 (Glackin Dep. at 282:12–83:1), Nov. 27, 2007.)

Applying the general principles of agency, we find that AT & T's failure to respond in any way to the allegedly unauthorized disclosure by Mr. Glackin, of which it obviously has been aware for a long time, justifies the "reasonable assumption" that AT & T assented to this disclosure. As mentioned, "[s]ilence may constitute a manifestation when, in light of all the circumstances, a reasonable person would express dissent to the inference that other persons will draw from silence. Failure then to express dissent will be taken as a manifestation of affirmance." *Restatement* § 1.03 cmt. b.

This is a case where a reasonable holder of a privilege, confronted with an unauthorized disclosure of privileged information, would have expressed dissent to that disclosure (and would have taken steps to limit its consequences). Failure to do so within a reasonable time frame may be construed as ratification. This is all the more so when, as in this case, the disclosure was made at a time when the potential for a contentious situation was clearly already present and the disclosure was quickly brought to the attention of persons within AT & T who should have appreciated its significance (even if Mr.

Glackin did not)—specifically, the Corporate Counsel who received a copy of the text of the March 27, 2004 e-mail with the March 18, 2004 e-mail enclosed within it.

AT & T suggests that in-house counsel "does not automatically have the authority to waive the corporate attorney-client privilege" (without actually stating that the corporate counsel in question did not have such authority). (Def.'s Mem. of Law on Remand in Further Opp. to Pl.'s Mot. to Compel Disclosure 10.) We do not need to decide whether AT & T's corporate counsel by himself possessed the authority to waive the privilege in this context. Because safeguarding the corporation's legal privilege is a task that is paradigmatically within the scope of responsibilities of the in-house counsel, we find that actions (or lack thereof) with regard to that legal privilege by the in-house counsel who also was involved in the discussions with BIS about termination, may reasonably be imputed to the company in this case. *Cf. United States v. John Doe Corp.* (*In re Grand Jury Proceedings*), 219 F.3d 175, 186 (2d Cir.2000) (considering that it may be "entirely appropriate to hold the corporation responsible" for disclosures by its in-house counsel in a case where that in-house counsel was also involved in preparing the company's defense in the litigation).

We further note that AT & T may well have had an interest in disclosing to BIS at least the basic thrust of its attorney's views. The proffered analysis served to justify AT & T's termination of the contract with BIS and hence the disclosure to BIS might well have been intended to avoid the possibility of litigation.

When litigation counsel became involved, they also did not take any action to rectify the unauthorized disclosure. On the contrary, litigation counsel for AT & T asked Mr. Glackin at his deposition about corporate counsel's analysis, thereby again inviting its potential disclosure to BIS.

We therefore conclude that the conduct of AT & T after the disclosure of the privileged information was such as to reasonably justify the conclusion that AT & T assented to that disclosure, or at least that the disclosure can

be imputed to AT & T. We therefore consider the disclosure to be voluntary, which leads to a waiver of the privilege to the extent described in our previous Memorandum and Order.

### IV. *Involuntary disclosure*

For analytical completeness, we also consider the alternative scenario—that the disclosure cannot be imputed to AT & T due to lack of both apparent authority and ratification. In that case, the disclosure would have to be qualified as an involuntary disclosure.

The federal courts have taken different approaches to the consequences of involuntary disclosure for the attorney-client privilege. These approaches range from the "lenient approach," in which the privilege is waived only if the disclosing party actually intended to waive it, *see, e.g., Mendenhall v. Barber–Greene Co.,* 531 F.Supp. 951, 954 (N.D.Ill.1982) ("[T]he better-reasoned rule is that mere inadvertent production does not waive the privilege."); *Georgetown Manor, Inc. v. Ethan Allen, Inc.,* 753 F.Supp. 936, 938 (S.D.Fla.1991), to the "strict test," under which any disclosure without compulsion extinguishes the privilege, whether the disclosure was intentional or not, *see, e.g., In re Sealed Case,* 877 F.2d 976, 980–81 (D.C.Cir. 1989), and include a so-called "middle-of-the-road approach," under which possible waiver depends on balancing of a number of factors. *See* 3 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence* § 503.42 (Joseph M. McLaughlin ed., 2d ed.2005).

■ In the Second Circuit, it appears that the "middle-of-the-road approach" has been adopted. *See In re Grand Jury Proceedings,* 219 F.3d at 188 (stating that "[not] all inadvertent disclosures mandate a finding of waiver" and citing *SEC v. Cassano,* 189 F.R.D. 83, 85 (S.D.N.Y.1999) and *United States v. Gangi,* 1 F.Supp.2d 256, 264 (S.D.N.Y.1998)); *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.,* 104 F.R.D. 103, 105 (S.D.N.Y.1985) (setting out four factors (discussed below) that the courts balance when assessing whether or not waiver has occurred); *accord, e.g., LaSalle Bank Nat'l Ass'n v. Merrill Lynch Mortgage Lending,*

*Inc.,* 2007 WL 2324292, at *4 & n. 4 (S.D.N.Y. Aug. 13, 2007) (citing and applying the "*Lois* factors"); *Cassano,* 189 F.R.D. at 85 (same); *Gangi,* 1 F.Supp.2d at 264 (same). The factors that are commonly taken into account in assessing the consequences of a disclosure under this middle-of-the-road approach are: (1) "the reasonableness of the precautions to prevent inadvertent disclosure," (2) "the time taken to rectify the error," (3) "the extent of the disclosure", (4) an "over[arching] issue of fairness and the protection of an appropriate privilege which . . . must be judged against the care or negligence with which the privilege is guarded. . . ." *Lois,* 104 F.R.D. at 105.

Although these factors were originally developed to assess possible waiver as a consequence of inadvertent disclosures of documents during discovery, they have subsequently found wider application. *See, e.g., Denney,* 362 F.Supp.2d 407 (sharing memo to outside counsel with other party); *Gangi,* 1 F.Supp.2d 256 (inadvertent filing of a confidential memorandum with the court); *Hydraflow, Inc. v. Enidine, Inc.,* 145 F.R.D. 626 (W.D.N.Y.1993) (inadvertent delivery to other party of documents intended for *in camera* review). We find that these factors provide a useful framework for evaluating the possibility of a waiver of the attorney-client privilege due to inadvertent disclosure prior to suit.

In applying the *Lois* factors to the present case, we recall that, in the face of the disclosure to BIS, it is for AT & T to show that its privilege was not waived due to this disclosure. We find that AT & T has not made such a showing.

### A. *Reasonableness of measures to prevent disclosure*

■ As to the first factor, the reasonableness of the measures taken to prevent disclosure, the record indicates that the actual memorandum prepared by AT & T corporate counsel bore a notice that it was "privileged and confidential attorney client information . . . exclusively for intended recipients" and should not be "forward[ed] or distribute [d] to anyone else." (Archer Decl. Ex. B, Nov. 28, 2007.) However, the measures taken by

AT & T to prevent disclosure of the contents of counsel's advice (rather than the document itself) were less than adequate. In the first place, AT & T allowed Mr. Glackin to be privy to counsel's advice and to continue to communicate with BIS, apparently without instructing him specifically not to disclose the contents of such analysis to BIS. Mr. Glackin testified that counsel did not instruct him not to disclose to BIS what counsel had told him. (*See* Perry Aff. Ex. 5 (Glackin Dep. at 287:12–20), Nov. 27, 2007).

From the record, it also appears that Mr. White—a Director of Indirect Channel at AT & T, at the same level within AT & T's corporate structure as Mr. Glackin (Archer Decl. Ex. A at ¶ 7, Nov. 28, 2007)—also was engaged in communicating the contents of counsel's advice to BIS. Mr. Nguyen of BIS wrote to Mr. Glackin: "I received a v[oice]mail from Jon White indicating that the attorney has come back with his findings and that he does not support the current model and processes." (Perry Aff. Ex. 3 at ATT000744, Aug. 10, 2007). Although Mr. White's communications—the exact contents of which are not in the record—were not relied on by us in concluding that a disclosure of privileged information had taken place, AT & T does not seem to have taken adequate measures to prevent potential disclosure of privileged information by Mr. White. This fact bears on our assessment of the reasonableness of AT & T's efforts to safeguard the privilege.

Furthermore, AT & T's counsel provoked further—or at least repeated—disclosure of the contents of counsel's opinions by asking Mr. Glackin about them in his last deposition. (*See* Perry Aff. Ex. 5 (Glackin Dep. at 282:12–83:24), Nov. 27, 2007).

### B. *Time taken to rectify the inadvertent disclosure*

The second factor, the time taken to rectify the error, also does not favor AT & T. As set out above (*see supra* p. 11), AT & T did not take the position that the disclosed information was privileged and disclosed in an unauthorized manner by Mr. Glackin until mid–2007, in the context of the present litigation. At no point in time did AT & T inform BIS that the e-mail contained information that was privileged and confidential, nor did defendant request return or destruction of the relevant e-mails. *Cf. Denney*, 362 F.Supp.2d at 417 (party claiming privilege did not guard it with appropriate care when it did not ask for return of privileged information); *Bank Brussels Lambert v. Credit Lyonnais (Suisse) S.A.*, 160 F.R.D. 437, 445 (S.D.N.Y.1995) ("Inordinate delay in claiming the privilege can prejudice the adversary and may be deemed a waiver." (citing *Baxter Travenol Labs., Inc. v. Abbott Labs.*, 117 F.R.D. 119, 121 (N.D.Ill.1987))); *see also* Weinstein & Berger, *supra*, § 503.42[4] ("In applying these factors, the courts give great significance to the promptness of measures taken to rectify the disclosure."). AT & T's invocation of the attorney-client privilege in this case may rightly be regarded as "an afterthought." *Hydraflow*, 145 F.R.D. at 638 (citing *Data Sys. of N.J. v. Philips Bus. Sys., Inc.*, No. 78 Civ. 6015, 1981 U.S. Dist. LEXIS 10290, at *17 (S.D.N.Y. Jan. 8, 1981)).[3]

### C. *Extent of the inadvertent disclosure*

The third factor in *Lois*, the extent of the inadvertent disclosure, is mainly of concern in the context of inadvertent disclosures during discovery, where the extent of disclosure is measured against the overall volume of documents involved in the discovery. We do not attach special weight to this factor in the case at hand, although it could be said that the volume of communications between AT & T and BIS at the relevant time was not such as to make it difficult for AT & T to monitor them closely and check each communication for possible disclosure of privileged information. *Cf. Local 851 of the Int'l Bhd. of Teamsters v. Kuehne & Nagel Air Freight, Inc.*, 36 F.Supp.2d 127, 131 & n. 7 (S.D.N.Y.1998) (arguing that extensive discovery may sometimes lead to excusable disclosures and that other circumstances may call for "stricter accountability" for inadvertent disclosure).

---

**3.** *Hydraflow* erroneously cites to *Data Sys. of N.J. v. Philips Bus. Sys., Inc.*, 1986 WL 733 (S.D.N.Y. Jan. 6, 1986), a different decision in the same case. The proposition for which the case is cited and the quote are found in the 1981 decision.

## D. *The issue of fairness*

Finally, we consider the "issue of fairness and the protection of an appropriate privilege which . . . must be judged against the care or negligence with which the privilege is guarded. . . ." *Lois,* 104 F.R.D. at 105. This factor weighs the "inevitable prejudice" to AT & T in finding that the privilege has been waived against the "converse prejudice to plaintiff if the inadvertent disclosure were found to not serve as a waiver." *LaSalle,* 2007 WL 2324292, at *6. Courts have noted that in this context, "defendant's rather significant delay in even addressing the inadvertent disclosure . . . severely undermines its contention that it has been unfairly prejudiced." *Id.* (citing *Lava Trading, Inc. v. Hartford Fire Ins. Co.,* 2005 WL 66892, at *3 (S.D.N.Y. Jan. 11, 2005)). In this case, there are no fairness concerns that justify rejection of the waiver argument in the face of Mr. Glackin's disclosures.

Factors that have been cited in other cases as relevant to the overall fairness assessment are not present in this case. This is not a situation in which privileged information was disclosed in a context in which the holder of the privilege could not exert control, such as grand jury testimony by one of its officers, *see In re Grand Jury Proceedings,* 219 F.3d at 185, or disclosure resulting from a conflict of interest between the disclosing person and the company. *See In re Grand Jury Proceedings,* 219 F.3d at 184–85. Mr. Glackin was employed by AT & T, was legitimately in possession of counsel's advice and has not been shown to have had ulterior motives in the disclosure. Furthermore, when communicating with BIS on behalf of AT & T about the termination of the contractual relationship, he was acting with the approval of the company, within the scope of his responsibilities within the company and upon consultation with corporate counsel. When a representative of a company, in his authorized dealings with a contractual partner—and,

more specifically, in the context of the company's termination of that contractual relationship—discloses to that other party the contents of counsel's legal opinion justifying the termination, it does not appear unfair to conclude that a waiver of the privilege has occurred.

A similar line of reasoning was adopted by the Court in *Denney:*

> Few cases have addressed the situation in which a single employee, officer or director of a corporation discloses privileged communications to a third party without the express authorization of the corporation's management. The Eastern District of Virginia, in an opinion that has been widely cited in the secondary sources, held that the privilege may be waived not only by officers and directors, but also by lower-level employees, when, acting on behalf of the corporation, they disclose attorney-client communications to third parties-at least where the corporation authorized the employee's possession of the confidential communication, and the corporation took inadequate steps to prevent the employee disclosing it.

362 F.Supp.2d at 414 (footnotes omitted) (citing *Jonathan Corp. v. Prime Computer, Inc.,* 114 F.R.D. 693 (E.D.Va.1987)).[4]

In sum, we conclude that, even if the disclosure were involuntary and inadvertent from AT & T's perspective, the circumstances of the case are such that the disclosure has triggered a limited waiver of the attorney-client privilege.

## CONCLUSION

For the reasons noted, we order defendant to produce, within ten days, certain documents otherwise covered by the attorney-client privilege. Specifically, defendant is to produce the documents reflecting the attorney analyses referred to in the cited e-mails from Mr. Glackin and the communications

---

4. AT & T distinguishes *Jonathan* by pointing out that in that case, the privileged communication disclosed by the lower-level employee was a memorandum that did not contain a warning or notification that it was privileged or confidential. (Def.'s Mem. of Law on Remand in Further Opp. to Pl.'s Mot. to Compel Disclosure 8–9.) However, like the court in *Denney,* we see a clear parallel between Jonathan and the case at hand, *i.e.,* a lower-level employee's authorized possession of privileged information and inadequate measures by the company to prevent disclosure thereof.

alluded to during deposition directing or recommending termination of the contract.

**SO ORDERED.**