# United States Court of Appeals

## For the First Circuit

No. 09-2291

OPHTHALMIC SURGEONS, LTD.,

Plaintiff, Appellant,

v.

PAYCHEX, INC.,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

[Hon. Mary M. Lisi, U.S. District Judge]

Before

Torruella, Ripple,[*] and Lipez,
Circuit Judges.

Daniel V. McKinnon, with whom McKinnon & Harwood, B. Jean
Rosiello, and MacFadyen, Gescheidt & O'Brien, were on brief for
appellant.
Robert K. Taylor, with whom Partridge Snow & Hahn LLP, was on
brief for appellee.

January 31, 2011

---

[*] Of the Seventh Circuit, sitting by designation.

**TORRUELLA**, **Circuit Judge**.  This case evidences the importance of careful contract drafting.  In this breach of contract case, the appellee's liability depends primarily on whether one sentence in the contract is clear and unambiguous.  Specifically, appellant, Ophthalmic Surgeons, Ltd. ("OSL"), alleges that Paychex, Inc. ("Paychex"), its provider of direct deposit payroll services, breached its obligations under a written agreement when, over a period of six years and without objection from appellant, it paid an OSL employee $233,159 more than her authorized annual salary of $33,280.  For the reasons explained below, we affirm the district court's grant of summary judgment in favor of Paychex.

## I.  Facts and Procedural History

OSL, a Rhode Island corporation, is a medical practice specialized in ophthalmology.  Dr. William J. Andreoni has worked at OSL as a physician and surgeon for twenty-six years.  He has been part owner of OSL since 1986 and became the sole owner of the practice in 1993.  During the mid-1980s, OSL began to grow.  Therefore, the company sought to find a better way to administer its payroll.  To this end, in 1989, OSL entered into an oral

contract with Paychex[1] for payroll processing services (the "1989 Agreement").[2]

In 1994, OSL and Paychex entered into a written contract pursuant to which Paychex was to provide direct deposit payroll services (the "1994 Agreement").  The contract is governed by New York law.  The relevant parts of the agreement state the following:

> 2.    <u>SERVICES TO BE PERFORMED</u>.  In addition to the services Paychex performs for the Client as a payroll client, client hereby employs Paychex to process direct deposit payroll in compliance with Automated Clearing House regulations.  One business day prior to the client's payroll check date, <u>Paychex is authorized to draw from Client's bank account as specified by Client, such amounts as are necessary to pay its employees</u>.  Such amounts are to be held in an account established by Paychex until check date when funds availability are [sic] due to the employee(s).
>
> 3.    <u>CLIENT'S RESPONSIBILITY</u>.  The Client agrees to accept the following obligations and responsibilities:
>      A.    To execute all necessary documentation so that Paychex may withdraw funds from the Client's bank account to process direct deposit payroll.
>      B.    To execute any other documents which may be required for Paychex to perform its responsibilities under this Agreement.

---

[1]  Paychex is a New York corporation, based in New York, with branch offices in several states, including Rhode Island.

[2]  Dr. Andreoni alleges that at the time of the formation of this original contract, he met with a Paychex representative who assured him that he would not have to worry about payroll.  Dr. Andreoni understood from this representation that Paychex would inform him if anything warranted his attention.  This is extrinsic evidence that OSL alleges goes to the parties' intent.

C.  To have available in Client's bank account sufficient funds for Paychex to make the withdrawals provided for by this Agreement.

. . .

5.    LIMITATION OF LIABILITY.  Paychex shall only be liable for its own negligence and not the negligence of any other person or entity which provides services as a result of Paychex's performance of its obligations under this Agreement.

(Emphasis added in ¶ 2.)  The contract also contains a merger clause stating that "[t]he Client acknowledges that there have been no other representations or warranties made by Paychex to the Client which are not set forth in this Agreement."

Paychex's Rhode Island office handles approximately 7,000 clients.  Paychex alleges that it performs its payroll processing services based on the information its clients provide.  Each new client, through its designated payroll contact, provides Paychex with the relevant employee information including names, addresses, social security numbers and salary information.  Paychex employees load this information onto a computer and use this information to process the client's payroll.  Paychex submits reports and other documents to its clients on a regular basis.  These reports include payroll journals and checks which are sent to the client prior to the date the checks will be paid to the employees.  Because Paychex charges its clients per check processed, invoices to clients indicate how many paychecks were issued per pay period.  Finally,

Paychex provides quarterly reports, yearly reports and W-2 earnings statements to all clients.

In 1984, Carleen Connor began working for OSL as a technician who earned $7.00 per hour. She later became a licensed optician and the office manager, at which point she earned $16.00 per hour. It is undisputed that, from the mid-1990s until her termination in 2006, Connor handled payroll for OSL and was its office manager and designated payroll contact.

Paychex contacted Connor regularly to inquire about OSL's payroll. As Dr. Andreoni was aware, Connor would often call in more than one week's worth of payroll at a time. OSL alleges that during the years that Connor requested unearned paychecks, 2001 to 2006, its employees were paid on a weekly basis.[3] In 2001, Connor began requesting that Paychex direct deposit into her bank account more money than required to pay her annual salary. During the pay periods when Connor requested more than her base pay, she requested that Paychex split her pay into two direct deposit payments. At some point, a Paychex representative told Connor that issuing her more than one payment for a given pay period was more expensive for OSL. Connor stated that she wanted to split her checks because a single larger check would result in a larger tax withholding. Paychex did not contact anyone at OSL to verify Connor's request.

_____

[3] During some years, OSL asked Paychex to run payroll using a bi-weekly pay period.

It is undisputed that between 2001 and 2006, Connor directed Paychex to pay her, and Paychex did in fact pay her, a total of $233,159 more than her authorized annual salary. It is also undisputed that Paychex sent to OSL reports confirming all payments made. These reports were sent to Connor's attention and Dr. Andreoni alleges that he saw none of these reports because they were not sent directly to his attention. OSL discovered the unauthorized payments when another employee took over Connor's duties.

On October 30, 2007, OSL and Dr. Andreoni, as co-plaintiffs, filed a breach of contract action in Rhode Island Superior Court against Paychex and Chase Bank, USA, NA. On November 14, 2007, Paychex removed the action to the United States District Court for the District of Rhode Island based on diversity jurisdiction in accordance with 28 U.S.C. § 1332.

On December 4, 2007, Paychex filed a motion to dismiss or, in the alternative, for a stay pending arbitration. On February 19, 2008, the district court denied the motion for a stay pending arbitration and denied the motion seeking to dismiss count one seeking damages for breach of contract, but granted the motion to dismiss count two seeking punitive damages. The court also dismissed Dr. Andreoni as an improper party plaintiff. On May 21, 2009, the parties stipulated to the dismissal of the claims against defendant Chase Bank, USA, NA.

On January 12, 2009, Paychex filed a motion for summary judgment. On February 25, 2009, OSL filed a response, to which Paychex filed a reply on March 18, 2009. On September 9, 2009, the district court issued summary judgment in favor of Paychex. OSL filed a timely notice of appeal on September 17, 2009. This court has jurisdiction pursuant to 28 U.S.C. § 1291.

## II. Discussion

### A. Standard of Review

"We review a district court's grant of summary judgment de novo." Fed. Ins. Co. v. Commerce Ins. Co., 597 F.3d 68, 70 (1st Cir. 2010). The court views the facts and draws all reasonable inferences in favor of the nonmoving party. Id. Granting summary judgment is appropriate if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).[4]

---

[4] On April 28, 2010, the Supreme Court of the United States approved amendments to Federal Rule of Civil Procedure 56, effective December 1, 2010.

> The standard for granting summary judgment remains unchanged. The language of subdivision (a) continues to require that there be no genuine dispute as to any material fact and that the movant be entitled to judgment as a matter of law. The amendments will not affect continuing development of the decisional law construing and applying these phrases.

Fed. R. Civ. P. 56 advisory committee's note to 2010 amendment. Because the amendment does not constitute a substantive change, we find that referring to the amended rule is just and practicable. Godin v. Schencks, No. 09-2324, 2010 WL 5175180, at *9 n.19 (1st Cir. Dec. 22, 2010).

## B. New York Law Governing Contract Interpretation

When considering a motion for summary judgment in a contract interpretation case, New York law requires the court to determine whether the contract is unambiguous with respect to the disputed question. Law Debenture Trust Co. of N.Y. v. Maverick Tube Corp., 595 F.3d 458, 465 (2d Cir. 2010). The determination of whether a contract provision is ambiguous is an issue of law. Id.

To determine whether a contract is ambiguous, the court must "'look[] within the four corners of the document, not to outside sources.'" JA Apparel Corp. v. Abboud, 568 F.3d 390, 396 (2d Cir. 2009) (quoting Kass v. Kass, 696 N.E.2d 174, 180 (N.Y. 1998)). Courts must review the entire contract and "[p]articular words should be considered, not as if isolated from the context, but in the light of the obligation as a whole and the intention of the parties as manifested thereby." Riverside S. Planning Corp. v. CRP/Extell Riverside, L.P., 920 N.E.2d 359, 363 (N.Y. 2009) (citation and internal quotation marks omitted).

Contract terms are ambiguous if the contract "could suggest 'more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.'" Fabozzi v. Lexington Ins. Co., 601

F.3d 88, 90 (2d Cir. 2010) (quoting Lightfoot v. Union Carbide Corp., 110 F.3d 898, 906 (2d Cir. 1997)) (applying New York law).

### C. The Direct Deposit Agreement

The relevant language of the 1994 Agreement is "Paychex is authorized to draw from Client's bank account as specified by Client, such amounts as are necessary to pay its employees." OSL posits that the district court erred by finding that this sentence was clear and unambiguous and by failing to give meaning to the second operative clause -- "such amounts as are necessary to pay its employees." Specifically, OSL states that the second operative clause is ambiguous because it can be interpreted as either creating a duty for Paychex to oversee whether the withdrawals are "necessary" to pay OSL's employees or allowing Paychex to withdraw from the client's account "blindly" as long as the designated payroll contact so ordered. Paychex, on the other hand, states that OSL's interpretation of the contract language would completely negate the specific authorization to withdraw funds "as specified by Client" by requiring Paychex to question whether the requested payroll payments are "necessary" even when the client authorized them. According to Paychex, the simplest reading of the agreement is that Paychex is authorized to withdraw from OSL's account only what OSL specifies is necessary to make the payroll payments that OSL requested and no more.

We find that the relevant contract language clearly and unambiguously establishes that it is the Client who has to specify the amounts that Paychex is authorized to withdraw from the Client's bank account. We read the second operative clause -- "such amounts as are necessary to pay its employees" -- to modify the first and to create a limitation on the amount of money that Paychex is authorized to withdraw from the Client's account and not as creating an affirmative responsibility for Paychex to verify the amounts the Client specifies.

We need not consider OSL's extrinsic evidence regarding the conversation Dr. Andreoni allegedly had with a Paychex representative in 1989 because we find that the provisions of the 1994 Agreement are clear and unambiguous. Law Debenture Trust Co., 595 F.3d at 466. New York law provides that "'extrinsic and parol evidence is not admissible to create an ambiguity in a written agreement which is complete and clear and unambiguous upon its face.'" S. Rd. Assocs., LLC v. Int'l Bus. Machs. Corp., 826 N.E.2d 806, 809 (N.Y. 2005) (citation omitted).

We must, however, examine the entire contract and view the relevant language "in the light of the obligation as a whole and the intention of the parties as manifested thereby." Riverside S. Planning Corp., 920 N.E.2d at 363. OSL argues that the relevant contract language describes one of Paychex's duties under the contract because it appears in the paragraph entitled "Services to

-10-

be Performed." Specifically, OSL alleges that the language "such amounts as are necessary to pay its employees" creates an obligation for Paychex to verify that the amounts that it withdraws each pay period match the employees' salaries. OSL also asserts that Paychex was responsible for verifying the amounts that Connor specified because paragraph three ("Client's Responsibility") does not list verifying such amounts as one of OSL's responsibilities.

Although the 1994 Agreement is not a model of a comprehensive contract, we do not view the fact that the section titled "Client's Responsibility" does not list verifying the amounts that Paychex is authorized to withdraw as indicating that this task is Paychex's responsibility. If we examine the whole agreement, other sections of the contract create obligations with which OSL must comply. For example, in paragraph four, "Client's Default," the parties create a duty for OSL to reimburse Paychex for all fees that it incurs as a result of OSL's failure to have sufficient funds in its accounts. Also, OSL's payment obligations are addressed in a separate paragraph. The fact that the "Client's Responsibility" paragraph does not list every one of OSL's obligations is not dispositive here.

After examining the contract as a whole, we conclude that the writing evidences the intent to agree that it was OSL's responsibility to specify the amounts that Paychex was authorized to withdraw from the accounts.

-11-

### D. Connor's Authority

Although we have found that the contract creates no obligation for Paychex to verify the information that the payroll contact provides, we must now examine whether agency law creates such an obligation. OSL argues that the district court erred by ignoring a disputed issue of material fact regarding Connor's lack of apparent authority to "specify" the withdrawal of payments adding up to more than her authorized weekly salary. We find that OSL's argument is without merit.[5]

A corporation must, by necessity, act through its agents. Kirschner v. KPMG LLP, 15 N.Y.3d 446, 465 (2010) (discussing general principles of agency and corporations). It is undisputed that Connor was in fact authorized to handle payroll and was the designated payroll contact assigned to communicate with Paychex. Connor's actual authority, however, did not extend to embezzling funds by authorizing the issuance of paychecks in amounts in excess

---

[5] Although the existence of apparent authority is normally a question of fact that courts do not resolve on a motion for summary judgment, here we find that even viewing the facts in the light most favorable to OSL, it is clear that OSL acted in a manner that created apparent authority in Connor. See Moreau v. Local Union No. 247, Int'l Bhd. of Firemen and Oilers, AFL-CIO, 851 F.2d 516, 520 (1st Cir. 1988) (affirming district court's grant of summary judgment based on its conclusion that the local unions had apparent authority to enter into binding side agreements); Minskoff v. Am. Express Travel Related Servs. Co., Inc., 98 F.3d 703, 708-09 (2d Cir. 1996) (recognizing that determining apparent authority involves a question of fact not usually resolved on a motion for summary judgment, yet finding sufficient evidence to determine that the agent had apparent authority as to use of a credit card).

of her salary as this is not what OSL, the principal, instructed her to do. The question remains, however, as to whether Connor was cloaked with apparent authority[6] such that Paychex could have reasonably relied upon her authority to issue additional paychecks in her name. Restatement (Third) of Agency § 2.03 cmt. a ("Apparent authority may survive the termination of actual authority or of an agency relationship.").[7] OSL argues that Connor had no apparent authority where OSL, as principal, did not act in a way that gave the appearance that Connor had the authority to order the paychecks at issue here and that Paychex is therefore liable for making the unauthorized payments.

---

[6] Under principles of agency, "[a]pparent authority may exist in the absence of authority in fact . . . ." Greene v. Hellman, 412 N.E.2d 1301, 1306 (N.Y. 1980). Actual authority refers to the manifestation that the principal makes to the agent. Id.; Restatement (Third) of Agency § 2.01 cmt. c ("Actual authority is a consequence of a principal's expressive conduct toward an agent, through which the principal manifests assent to be affected by the agent's action, and the agent's reasonable understanding of the principal's manifestation."). Apparent authority arises when the agent deals with third parties and refers to the manifestation that the principal makes to the third party. Greene, 412 N.E.2d at 1306; Restatement (Third) of Agency § 2.03 cmt. c ("Apparent authority holds a principal accountable for the results of third-party beliefs about an actor's authority to act as an agent when the belief is reasonable and is traceable to a manifestation of the principal.").

[7] We find it appropriate to cite the Restatement (Third) of Agency because the New York Court of Appeals recently relied on it when discussing traditional agency principles. See Kirschner, 15 N.Y. 3d at 468-69. We also note that New York courts have consistently relied on the Restatement (Second) of Agency. See, e.g., Standard Funding Corp. v. Lewitt, 678 N.E.2d 874, 877 (N.Y. 1997); Hallock v. State, 474 N.E.2d 1178, 1181 (N.Y. 1984); Greene, 412 N.E.2d at 1305-06.

We recognize that "[t]he mere creation of an agency for some purpose does not automatically invest the agent with 'apparent authority' to bind the principal without limitation." Ford v. Unity Hosp., 299 N.E.2d 659, 664 (N.Y. 1973). Under New York law, apparent authority can only be created through "'words or conduct of the principal, communicated to a third party'" such that a third party can reasonably rely on the "'appearance and belief that the agent possesses authority to enter into a transaction.'" Standard Funding Corp. v. Lewitt, 678 N.E.2d 874, 877 (N.Y. 1997) (quoting Hallock v. State, 474 N.E.2d 1178, 1181 (N.Y. 1984)) (emphasis added).

We find that Paychex's reliance was reasonable and that Connor had apparent authority because OSL put Connor in a position where it appeared that she had the power to authorize additional paychecks. Telenor Mobile Commc'ns AS v. Storm LLC, 584 F.3d 396, 411 (2d Cir. 2009) ("Under New York law, an agent has apparent authority if 'a principal places [the] agent in a position where it appears that the agent has certain powers which he may or may not possess.'") (citation omitted). In her position as the designated payroll contact, Connor often called in more than one week's worth of payroll at a time without objection from OSL. Further, Dr. Andreoni admits that, after 1989, he had no further contact with Paychex. Even if we assume that, in 1989, the purported conversation between Dr. Andreoni, as agent of OSL, and a

-14-

representative of Paychex occurred[8] and that during that conversation, Dr. Andreoni informed Paychex that he wanted OSL employees to be paid weekly for fifty-two weeks each year, OSL's argument fails.[9] This conversation does not expressly convey a limitation on Connor's authority, especially where the conversation did not occur in connection with the formation of the 1994 Agreement. Further, it was reasonable for Paychex to assume its clients' needs might change and that the payroll contact would be authorized to convey such a change.

Paychex's reliance was also reasonable because of OSL's failure to object to the transactions that Connor authorized.

> A principal's inaction creates apparent authority when it provides a basis for a third party reasonably to believe the principal intentionally acquiesces in the agent's

---

[8] We briefly consider OSL's parol evidence, not to alter the terms of the contract, but with respect to Paychex's obligations under principles of agency. See Wooster v. Sherwood, 25 N.Y. 278 (1862) (parol evidence admissible where it did not tend to vary or change the written contract); McCormack Motor Sales v. Hayes, 346 N.Y.S.2d 460, 460 (App. Div. 1973) (finding, in an action to recover balances due on contracts, that the parol evidence rule did not preclude proof of defendant's claims with respect to whether the agent had apparent authority). We refer to New York law regarding the admissibility of parol evidence because it is a rule of substantive contract law. See Wheeler v. Blumling, 521 F.3d 1, 4 (1st Cir. 2008) (noting that the parol evidence rule is a rule of substantive law); Petereit v. S.B. Thomas, Inc., 63 F.3d 1169, 1177 (2d Cir. 1995) (concluding that the parol evidence rule is "a rule of substantive contract law, not a rule of evidence").

[9] OSL argues that these instructions limit Connor's authority such that she could only order 52 paychecks a year for each employee. As such, Paychex should have questioned Connor when she ordered more than 52 paychecks for herself.

-15-

> representations or actions. . . . If the third party has observed prior interactions between the agent and the principal, the third party may reasonably believe that a subsequent act or representation by the agent is authorized because it conforms to the prior pattern observed by the third party. The belief is thus traceable to the principal's participation in the pattern and failure to inform the third party that no inferences about the agent's authority should be based upon it.

Restatement (Third) of Agency § 3.03 cmt. b (internal citation omitted).[10] In _Minskoff_ v. _American Express Travel Related Services. Co., Inc._, 98 F.3d 703 (2d Cir. 1996), the Second Circuit found such inaction or omission sufficient to create apparent authority in an agent who was fraudulently using her employer's credit card. _Id._ at 709-10.

We find the Second Circuit's reasoning in _Minskoff_ persuasive.[11] _Minskoff_ involved an office assistant, Susan Schrader

---

[10] We find it reasonable to infer that the New York Court of Appeals would adopt the Restatement (Third) of Agency with respect to this issue because apparent authority based on a principal's inaction is similar to the principle of estoppel to deny apparent authority that the Second Circuit applied in _Minskoff_ v. _American Express Travel Related Services Co., Inc._ 98 F.3d 703, 708 (2d Cir. 1996) (citing Restatement (Second) of Agency § 8b) (applying New York Law regarding apparent authority); _see also_ Restatement (Third) of Agency Introduction (noting that this Restatement deals with situations where an agent is claimed to have acted without the principal's consent and acknowledging that the legal consequences of such appearances of agency are governed principally by apparent authority and to a lesser degree estoppel).

[11] Although _Minskoff_ involved the application of the Truth in Lending Act, 15 U.S.C. § 1601 _et seq._, which explicitly defines "unauthorized use" of a credit card, the court determined that Congress contemplated "primary reliance on background principles of

-16-

Blumenfeld, who was explicitly responsible for the personal and business affairs of a company's president and CEO. Id. at 706. Her duties included screening her employer's mail, reviewing credit card statements, and forwarding these statements to the company's bookkeepers for payment. Id. Less than a year after she began working for the company, Blumenfeld fraudulently requested that American Express issue an additional credit card in her name for the company's corporate account. Id. After discovering the fraud over one year later, the company filed a suit to recover the money the company had paid in connection with the unauthorized charges and sought a declaration that it was not liable for the outstanding balances. Id. at 707. The court held that, pursuant to the Truth in Lending Act, Blumenfeld acted without actual, implied, or apparent authority when she forged the credit card applications. Id. at 708 (finding that there was no apparent authority to order an additional credit card where Congress intended that cases involving charges incurred due to involuntary card transfers are unauthorized under the Truth in Lending Act). However, the court held that there was apparent authority for Blumenfeld's subsequent use of the fraudulently obtained credit card where the company failed to examine credit card and bank statements documenting the fraudulent charges. Id. at 709-10 ("A cardholder's failure to

agency law in determining the liability of cardholders for charges incurred by third-party card bearers." 98 F.3d at 708 (internal quotation marks and citation omitted).

examine credit card statements that would reveal fraudulent use of the card constitutes a negligent omission that creates apparent authority for charges that would otherwise be considered unauthorized under the [Truth in Lending Act].").

        We find Minskoff directly applicable to these circumstances.  Like the company in Minskoff, OSL failed to examine the payroll reports that Paychex sent.  That these reports were sent to Connor's attention is not dispositive where OSL, as principal, did not convey any instructions to Paychex that it should do otherwise.  Further, OSL's failure to object to the "extraordinary" transactions would reasonably convey to a third party that it acquiesced in its agent's acts.  Cf. id. at 710 (noting that the company's omissions created a continuing impression that nothing was wrong with the accounts); Bus. Integration Servs., Inc. v. AT&T Corp., 251 F.R.D. 121, 128 (S.D.N.Y. 2008) ("Applying the general principles of agency, we find that [the principal's] failure to respond in any way to the allegedly unauthorized disclosure [of its agent], . . . of which it obviously has been aware for a long time, justifies the 'reasonable assumption' [of assent]. . . . Silence may constitute a manifestation when . . . a reasonable person would express dissent to the inference that other persons will draw from silence.") (internal quotation marks and citations omitted).

We find that by placing Connor in a position where it appeared that she had authority to order additional checks and by acquiescing to Connor's acts through its failure to examine the payroll reports, OSL created apparent authority in Connor such that Paychex reasonably relied on her authority to issue the additional paychecks.

### E. Implied Covenant of Good Faith and Fair Dealing

We understand OSL's final claim against Paychex to be that Paychex breached the implied covenant of good faith and fair dealing when it negligently failed to check Connor's request for paychecks that amounted to more than her allowed annual salary. We find that Paychex did not breach the implied covenant.

New York law recognizes the existence of an implicit covenant of good faith and fair dealing. See Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc., 487 F.3d 89, 98 (2d Cir. 2007); Kalisch-Jarcho, Inc. v. City of New York, 448 N.E.2d 413, 416 (N.Y. 1983) (citing Restatement (Second) of Contracts § 205). "Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement." Restatement (Second) of Contracts § 205. "[L]ack of diligence and slacking off" has been recognized as bad faith. Id. cmt. d.

Good faith is ordinarily an "excluder" – it typically is not explicitly defined, but is defined in contrast to examples of bad faith. Robert S. Summers, The General Duty of Good Faith – Its

Recognition and Conceptualization, 67 Cornell L. Rev. 810, 820 (1982); Restatement (Second) of Contracts § 205 cmt. d; but see U.C.C. § 1-201(b)(20) (defining "good faith" as "honesty in fact in the conduct or transaction concerned"). New York courts have, however, recognized that the covenant of good faith and fair dealing "embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." Tractabel Energy Mktg., Inc., 487 F.3d at 98 (quoting Dalton v. Educ. Testing Serv., 663 N.E.2d 289, 291 (N.Y. 1995)). Further, "[t]he implied covenant of good faith encompasses 'any promises which a reasonable person in the position of the promisee would be justified in understanding were included' in the agreement . . . ." 1-10 Industry Assocs., LLC v. Trim Corp. of Am., 747 N.Y.S.2d 29, 31 (App. Div. 2002) (internal citations omitted). Courts may not, however, use the covenant to imply an obligation that "would be inconsistent with other terms of the contractual relationship." Dalton, 663 N.E.2d at 292 (internal quotation marks and citation omitted).

We do not think the facts of this case constitute a breach of the implied covenant of good faith. First, we have found that Paychex has not breached any explicit contractual obligation. Second, Paychex complied with its duty of good faith by regularly sending reports. That Dr. Andreoni, OSL's sole owner, failed to

check on OSL's employee or to specify to Paychex that the reports should be sent to his attention does not suggest that Paychex breached the implied covenant of good faith.  OSL was in the best position to monitor its finances and its employees.  If there is any negligence to be found in this case, it is OSL's own negligence in failing to properly supervise Connor.  Cf. Minskoff, 98 F.3d at 709-10 (stating that company's failure to examine its credit card statements that would reveal employee's fraudulent use constituted a negligent omission); Kirschner, 15 N.Y.3d at 465 ("The risk of loss from the unauthorized acts of a dishonest agent falls on the principal that selected the agent.") (internal quotation marks and citations omitted).

### III.  Conclusion

For the reasons stated, we affirm the district court's grant of summary judgment in appellee's favor.

**Affirmed**.